LAURETTA HEESACKER, APPELLEE, v. CHRIS BOSTED, APPELLANT.

FILED MAY 19, 1936.   No. 29515.

*Wear, Boland & Nye,* for appellant.

*Dorsey, Baldrige & Chew, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

EBERLY, J.

This is an action for personal injuries resulting from

an automobile accident which occurred on June 18, 1933. The plaintiff was riding with the defendant, in defendant's car, as his invited guest. Thus, the situation is within the purview of section 39-1129, Comp. St. Supp. 1933, the so-called "invited guest statute." So far as applicable to the present case, it provides, in effect, that the owner or operator of a motor vehicle shall not be liable for any damages to any person riding in said motor vehicle as a guest and not for hire, unless such damage is caused by the gross negligence of the owner or operator.

There was a trial to a jury. At the conclusion of the evidence, the defendant made a motion based upon its insufficiency, in the alternative, to either dismiss plaintiff's petition, or to direct the jury to return a verdict for the defendant. This motion was overruled. The verdict returned by the jury was for plaintiff. From the order of the district court overruling his motion for a new trial, and his motion to set aside the verdict and for judgment of dismissal, the defendant appeals.

The salient and controlling question presented by the appeal is the sufficiency of the evidence to support the judgment.

Preliminary to a consideration of the evidence is the determination of the proper construction of the statute referred to above. On the subject as related to the question of the sufficiency of the evidence contemplated by the terms of the legislation under consideration, we have said:

"A correct decision depends on the meaning of the term 'gross negligence.'

"The term 'gross negligence' has received the attention of many courts, with conflicting views as to its proper definition. The courts of some of the states appear to hold that, to constitute gross negligence, there must have been an intentional failure to perform a manifest duty, or the injury must have been inflicted intentionally, or in wanton disregard of the rights of others. Other courts have defined it less drastically.

"We are of the opinion that in adopting the guest act

the legislature used the term 'gross negligence' as indicating a degree of negligence. Negligence may be slight, ordinary, or gross. Gross negligence means great or excessive negligence; that is, negligence in a very high degree. It may be said that it indicates the absence of even slight care in the performance of a duty, and such, we think, is the meaning intended by the legislature.

"What amounts to gross negligence in any given case must depend upon the facts and circumstances. What would amount to gross negligence under certain circumstances might, under different circumstances, be even slight negligence. Ordinarily, the question of negligence, whether slight or gross, is one of fact. If the evidence respecting it is in conflict and is such that ordinary minds might draw different conclusions therefrom, then a question of fact is presented for the jury to determine. Where a question of fact has been submitted to a jury upon conflicting evidence, this court, ordinarily, will assume the truth of the evidence tending to sustain the finding of the jury." *Morris v. Erskine,* 124 Neb. 754, 248 N. W. 96.

These principles so enunciated have been repeatedly approved by this court. See *Gilbert v. Bryant,* 125 Neb. 731, 251 N. W. 823; *Swengil v. Martin,* 125 Neb. 745, 252 N. W. 207; *Sheehy v. Abboud,* 126 Neb. 554, 253 N. W. 683; *Rogers v. Brown,* 129 Neb. 9, 260 N. W. 794.

Within the scope of the doctrine of "gross negligence," as thus announced, did the plaintiff, by her petition and the evidence introduced in support thereof, present an appropriate issue of fact for the consideration of and determination by the trial jury?

So far as charging gross negligence is concerned, the plaintiff pleads the following only: "In driving his said car at the time and place and in the manner aforesaid, the defendant was guilty of gross negligence, directly and proximately causing the plaintiff's injuries hereinafter set forth, in the following particulars, to wit: (a) In driving said car upon the road, knowing that one of its

rear tires was in the defective and unsafe condition hereinbefore described; (b) in driving said car at an excessive, dangerous, and unlawful rate of speed; (c) in attempting to pass said truck from the rear without moderating the excessive, dangerous and unlawful speed at which he was driving, thus causing his said car to swerve from side to side in the road and subjecting said defective tire to unnecessary strain and friction; and (d) in driving his said car at an excessive, dangerous and unlawful rate of speed, when he knew that one of its rear tires was in the defective, weakened and unsafe condition hereinbefore described."

The consideration of the evidence submitted to the jury, in connection with the allegations quoted, established the occurrence of the accident, and the infliction of serious injuries to the plaintiff as a result thereof.

There appears little or no conflict in the evidence as to the facts that comprise this transaction, and the sole question is to determine the proper deductions which the proved facts support, in relation, first, to the alleged use of a rear tire by the defendant, knowing that the same was in a defective and unsafe condition; second, to the driving of the car at the time of the accident at a dangerous, excessive and unlawful rate of speed while attempting to pass a truck on the public highway near Fremont, Nebraska.

It is to be kept in mind that the defendant was rendering wholly gratuitous services at the time of the accident, in transporting the plaintiff and her sister from Omaha, Nebraska, to the home of her parents in Humphrey, Nebraska. As to the occasion of the trip, plaintiff's witness says: "Well, Mr. Bosted had promised my folks a few weeks before my sister's vacation to take her home for the vacation, and my sister didn't know until the morning of that day that she was going to get off. About 10 o'clock she called me, and I in turn talked to Mr. Bosted. Mr. Bosted wanted to go to the air races that day and it disappointed him very much not to be able to see the races,

so I offered to put my sister on the train and Mr. Bosted thought that wasn't showing any appreciation at all for him to not take her, after telling my folks he would take her."

It appears, without question, that under this arrangement the trip to Humphrey was started, during which the accident in suit occurred.

As to the tire in which the blow-out occurred, and which all parties agree was the immediate cause of the accident, the defendant borrowed it from the T. J. O'Brien & Company for use while his own tire was being repaired. With permission of its owner, the defendant removed it from a "used car," kept in O'Brien & Company's place of business, and replaced the tire of his own car with it. This occurred three days before the accident, and during the intervening time the borrowed tire was in use on defendant's automobile. The tire itself was designated in the trade as a "Goodrich Silvertown, extra heavy, six-ply." Thus, according to plaintiff's uncontradicted witness, it was of a class of tires which are deemed very serviceable. This witness also testified that at the time of the trial this tire had gone approximately 10,000 miles, and while it will vary, the average approximate life of a Goodrich Silvertown tire is about 20,000 miles. This witness further testified: "Q. Looking at this tire now, Mr. Meyer, from your experience as a tire man, I will ask you to state whether that looks like a reasonable tire to be used, or not? A. From the tread on it, it is a reasonable tire, but there must be something wrong with it. It was dead or something, that caused it to go out. Looking at it from the surface, it looks reasonable, but the marks here show it has been bruised in different places, but you can't tell whether this was caused before that, but there are marks here (indicating)."

With reference to the presence of a "boot" in this tire, the plaintiff's evidence was as follows: "Q. Well, this is what they call a boot, is it (indicating)? A. Yes, sir. Q. Why do they use a boot in a tire? A. Sometimes a

large nail has gone through and torn it. Q. Does it show the tire was weakened? A. To some extent it has been. *. * * Q. The application of a boot such as I hold in my hand is a common practice in the tire business, to repair a casing, isn't it? A. When a casing is somewhat defective, or possibly has a large nail hole in it, or some sort of hole, it prolongs the life of it. Q. Well, it is a common thing to use a boot? A. Yes, sir. Q. A great many of these boots are used in the repair of tires, aren't they? A. Yes, sir. Q. And that is especially true is it not of a six-ply tire, extra heavy, Goodrich Silvertown that has a good tread on it, isn't it? A. Is it usual for them to put a boot in, you mean? Q. Sure; on a tire that only had gone 10,000 miles and has a good tread, as this one has? A. Oh, any make of tire might have a boot in it. It don't have to be a Silvertown. * * * Q. Whether Goodrich, Firestone, U. S., or any of them? A. Yes, sir."

With reference to the "air container" being a part of the equipment of the tire in question, this same witness testified, in part, as follows: "Q. Isn't this exhibit which I hold in my hand, known as an air container, the latest invention in pneumatic tire construction? A. As far as I know, it is. Q. It is supposed to be, as far as safety is concerned, the safest thing on the road, isn't it? A. I can't say that definitely. Q. Well, from your experience? A. Yes, sir; from my experience it is as safe."

There is no definite evidence in the record that this tire, in which the "blow-out occurred," was removed from a "junked car" or a car about to be "junked;" and no affirmative evidence that its condition appeared to be, or in fact was, actually dangerous. Prior to the accident this tire had been in use three days; during these three days it had been run and no trouble was caused by the tire; and on the day of the accident it had carried the occupants of this car over the road for a distance of approximately 30 miles without evidencing defect or weakness. It is to be remembered that the mere fact that a "blow-out" occurred is no evidence of negligence on the part of the

owner of the car. *Tsiampras v. Union P. R. Co.*, 104 Neb. 205, 176 N. W. 366.

The striking character of the adventure under consideration is that it was undertaken solely for the benefit of the plaintiff and her friends, and that, in a general way, the plaintiff was well acquainted with the characteristics of the defendant as an automobile driver. It was wholly gratuitous on his part. This situation constitutes an element for consideration in connection with the question of the defendant's negligence. Thus, as pertaining to bailments, it has been said "that the degree of care required of the gratuitous bailee is such slight care as is taken by every man of common sense of his own property." 3 R. C. L. 101, sec. 26. See, also, 6 C. J. 1125.

In *O'Shea v. Lavoy*, 175 Wis. 456, 185 N. W. 525, the supreme court of Wisconsin gives us the following summary of a situation, which is quite applicable to the case here presented:

"Owen, J. The automobile is an instrumentality of recent creation which has rapidly established itself in the desires of the people. No other agency has so effectively appealed to their favor. Nothing contributes so much to the comfort and pleasure, the welfare and happiness of the family. It has given a new idea to distances and materially enlarged the orbit of individual existence. It affords recreation which appeals to every member of the family and pleasures which may be indulged by the family unit. It is a minister of health as well as pleasure. It makes the fresh air of the country available to the citizen of the congested city and brings the pleasures of the city within the reach of the rural inhabitants. There are many who cannot afford to own an automobile. There are few who do not covet the comfort, pleasure, and recreation afforded thereby. It is an act of kindness and consideration for the owner of a car to lend its comfort and pleasure through an invitation extended to his less fortunate neighbor for a ride in the country, to join a picnic party, or to enjoy an evening at the theater in the near-by city. This is a

species of hospitality which should be encouraged rather than discouraged, and the law should not couple with this friendly act a duty which makes its exercise an unreasonable hazard. On the other hand, he who takes his friends and neighbors into his automobile places them in a high-powered, swiftly-moving vehicle attended with great danger unless handled and operated with a requisite degree of care. He must realize that he has voluntarily received into his keeping the lives and safety of his passengers, and he should not be permitted to trifle therewith or to renounce all responsibility in such respect."

On principle, it may be said that the relation between the parties in the instant case is analogous to that between licensor and licensee; and following the principle applicable to and controlling defective buildings and premises, it may be said the licensee takes the vehicle as he finds it. 5-6 Huddy, Cyclopedia of Automobile Law (9th ed.) 221, sec. 131; *Patnode v. Foote,* 153 App. Div. 494, 138 N. Y. Supp. 221; *Pigeon v. Lane,* 80 Conn. 237, 67 Atl. 886; *Beard v. Klusmeier,* 158 Ky. 153, 164 S. W. 319; *Fitzjarrel v. Boyd,* 123 Md. 497, 91 Atl. 547.

In *Gifford v. Dice,* 269 Mich. 293, 257 N. W. 830, Wiest, J., in discussing the affirmative duties imposed on the owner of an automobile, says, in part:

"A guest in an automobile accepts the means of conveyance in the condition it is maintained by the owner, and cannot predicate an action for gross negligence or wilful and wanton misconduct upon failure of the owner to inspect the car and keep it in such repair as to avoid the possibility of an accident. So, in this case, defendant owed no duty to plaintiff as his guest to keep the car tire in such a condition of repair as to prevent a blow-out or to replace the worn tire by another. The owner of a car, under circumstances such as in the case at bar, is only required to provide his guest with the conveyance he provides for himself."

And, the Michigan supreme court, in the *Gifford* case, completed the opinion with the following conclusion, viz.:

"Defendant, for his own purposes, had a right to get all the use he could out of the tire, and his own purposes were not curtailed nor liability entailed by reason of plaintiff becoming his guest."

In discussing a claim of gross negligence founded upon the use of a defective tire, the supreme court of Washington in *Eubanks v. Kielsmeier,* 171 Wash. 484, 18 Pac. (2d) 48, say, in part:

"The first (ground) relates to a claim of negligence in the use of a defective tire. * * * It appears that, about two. months before the accident, during a trip of the Kielsmeiers to California, a wire nail had caused a puncture of the tire; repair was made by having a boot cemented within the tire. There was no evidence that the tire was not otherwise in good condition at that time. On the other hand, there was evidence that the use of a boot is a matter of common practice. Accessories of this character are generally carried by dealers and service stations for just such purposes, and, according to the evidence, seventy-five per cent. of automobile drivers frequently use accessories of this kind. Certainly, the mere use of a boot in the repair of a tire otherwise in good condition cannot be said to constitute gross negligence."

See, also, *Newville v. Weller,* 217 Ia. 1144, 251 N. W. 21; *Fleming v. Thornton,* 217 Ia. 183, 251 N. W. 158; *Stanbery v. Johnson,* 218 Ia. 160, 254 N. W. 303.

*Kelley v. Gagnon,* 121 Neb. 113, 236 N. W. 160, was determined by this court in a transaction that occurred in South Dakota, prior to the enactment of the guest statute, and the deciding question here could not have been presented in that case. Yet, Paine, J., closes a discussion on the condition of the tires of the automobile, charged with causing the accident in that case, with the words: "It is clear that these tires were in fair, second-hand condition, not all of the tread being worn smooth."

A careful consideration of all the evidence, in connection with that quoted and otherwise referred to, is convincing that it furnishes no support whatever for a charge of even

ordinary negligence so far as based on the fact of the use of the borrowed tire.

In reference to the charge that immediately prior to and at the time of the accident, in attempting to pass a truck proceeding in the same direction, the defendant was driving his automobile at a dangerous and unlawful rate of speed, and thereby caused the accident, it may be said that chapter 105, Laws 1933 (Comp. St. Supp. 1933, sec. 39-1193), passed and approved with an emergency clause on March 14, 1933, was in force and effect. Its provisions applicable to the facts in the instant case, were: "No person shall operate a motor vehicle on any highway outside of a city or village at a rate of speed greater than is reasonable and proper, having regard for the traffic and use of the road and the condition of the road, nor at a rate of speed such as to endanger the life or limb of any person." The former limitation, viz., "nor in any case at a rate of speed exceeding forty-five miles per hour" (Comp. St. 1929, sec. 39-1102), had been repealed and no definite limitation was reenacted. This statute must be applied to the facts in the instant case in strict conformity with the principle, viz.: "The running of a motor vehicle at an excessive speed renders the wrong-doer liable only for those injuries which proximately result from the unlawful speed." 3-4 Huddy, Cyclopedia of Automobile Law (9th ed.) 330, sec. 173. See *Johnson v. City of Omaha*, 108 Neb. 481, 188 N. W. 122.

The road at the immediate scene of the accident was practically a level, straightaway, graded one, with a paved roadway some 20 feet in width thereon. There was no obstructing traffic which in any manner affected defendant's automobile or the movements of the truck sought to be passed by him, at or near the scene of the accident. It was broad daylight; the roadway was dry; visibility was in no manner impaired. Immediately preceding the accident there is no evidence of loss of control of his car by defendant until the moment of the blow-out, and such loss of control which then ensued was plainly due to

the condition created by that accident as the proximate cause thereof. There was no collision with the truck or any other object, and no lack of care on part of defendant, except as may be evidenced by the rate of speed at which his automobile was then traveling, which was between 50 and 60 miles an hour. The proximate cause was clearly the "blow-out," and not the speed. Even if speed be regarded as a contributing cause, and thereby negligence of defendant is established, still it fails to rise to the condition of "gross negligence" as that term is employed in the controlling statute.

In view of all the facts and circumstances disclosed in the record, the members of this court are unanimous of the opinion that the evidence is insufficient to support the judgment.

The judgment of the district court is, therefore, reversed and the action dismissed.

REVERSED AND DISMISSED.