## STATE FARM MUT. AUTOMOBILE INS. CO. v. BONACCI et al.

### No. 11468.

Circuit Court of Appeals, Eighth Circuit.

April 22, 1940.

---

W. C. Fraser, of Omaha, Neb. (C. F. Connolly and Crofoot, Fraser, Connolly & Stryker, all of Omaha, Neb., on the brief), for appellant.

E. D. O'Sullivan, of Omaha, Neb. (C. J. Southard and George H. Merten, both of Omaha, Neb., on the brief), for appellees.

Before STONE, GARDNER, and SANBORN, Circuit Judges.

GARDNER, Circuit Judge.

.This is an appeal from a judgment in a proceeding for a declaratory judgment, in which appellant sought to avoid liability under the provisions of a policy of automobile liability insurance because of the failure of its insured, Thomas Cerra, actively to cooperate in accordance with a provision in the policy, in defending separate actions brought by appellees Antonio Bonacci and Angelina Bonacci against the appellee Thomas Cerra, the insured, for damages arising out of an automobile accident, and because the insured was guilty of conspiracy and fraud in conniving and colluding with the Bonaccis in such damage actions. It will be convenient to refer to the parties as they were designated in the lower court.

The policy, which plaintiff had issued covering Cerra's car, contained provision that the insurer would, within limits not

here material, protect the insured against liability for bodily injuries to others. It contained the following provision: "It is a condition of this insurance that the Assured, when requested by the Company, shall aid in effecting settlements, securing information and evidence, securing the attendance of witnesses and in prosecuting appeals, and shall, throughout such litigation, actively co-operate with the Company and its representatives in the defense thereof, and attend upon any hearing or hearings therein, when requested by the Company or its representatives."

The policy also contains provision that it should be void in the case of any "fraud, attempted fraud, or false swearing by the Assured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

On August 15, 1935, the automobile covered by this insurance policy, while being driven by the insured, met with an accident on a paved highway about five miles east of Grand Island, Nebraska. At the time, defendants Antonio Bonacci and Angelina Bonacci occupied the rear seat as guests of the insured. The automobile got out of control of the driver and went into the ditch on the left side of the paved highway, causing injuries to the defendants Antonio Bonacci and Angelina Bonacci, his wife.

In October, 1935, the Bonaccis commenced separate actions against Cerra in the District Court of Douglas County, Nebraska, to recover damages for the injuries sustained in the accident. The case of Antonio Bonacci was first tried in January, 1937, and resulted in a verdict in favor of the defendant in that case. On appeal the judgment was affirmed by the Supreme Court. Bonacci v. Cerra, 134 Neb. 476, 279 N.W. 173. The case of Angelina Bonacci was postponed because of Cerra's absence, but was tried in March, 1937, resulting in a verdict for the defendant. In April, 1937, a new trial was granted in the last named case, and it was again tried in May, 1937, and resulted in a verdict for the plaintiff. On appeal, however, the judgment was reversed by the Supreme Court. Bonacci v. Cerra, 134 Neb. 588, 279 N.W. 314. The present proceeding was then commenced against Cerra and the two Bonaccis, seeking an adjudication that the insured had violated the provisions of the policy in the respects heretofore mentioned. Plaintiff in the instant case defended Cerra in the personal injury actions brought by the Bonaccis, but with a reservation that it did not waive the right to deny liability to its insured. In the instant case the lower court determined the issues in favor of the defendants.

On this appeal, plaintiff contends that the evidence shows that the insured failed actively to cooperate with the insurer, and that he was guilty of fraudulently conspiring with the Bonaccis to create a cause of action for the recovery of damages for injuries sustained in the accident for which the plaintiff would be liable under its contract. If the insured failed actively to cooperate in the defense of the damage actions brought by the Bonaccis, or if he fraudulently conspired with these adverse parties to create the appearance of a valid cause of action against him, then the contractual obligation of the insurer would terminate and the insurance company would be under no obligation to defend the actions, nor to pay any judgment that might be recovered. General Casualty & Surety Co. v. Kierstead, 8 Cir., 67 F.2d 523; Ohio Casualty Co. v. Swan, 8 Cir., 89 F.2d 719; Coleman v. New Amsterdam Casualty Co., 247 N.Y. 271, 160 N.E. 367, 72 A.L.R. 1443.

It is a condition precedent to the right of recovery under this policy, that the insured shall "actively cooperate with the Company" in the defense of damage actions. It has been held that cooperation, in the sense used in such policies, requires that the insured should make a fair and frank disclosure of information reasonably demanded by the insurer, to determine whether there is a genuine defense. Ohio Casualty Co. v. Swan, supra. The contract here requires that the insured "*actively* cooperate," and in that regard this requirement is at least more emphatic and definite than a policy simply requiring that the insured "cooperate."

It is urged that we are bound in this case by the findings of the lower court on these issues. Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, is as follows: "In all actions tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the

grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court."

■ The rule plainly contemplates a review by the appellate court of the sufficiency of the evidence to sustain the findings. If this were not true, the provision that requests for findings are not necessary "for the purpose of review" would be meaningless. If the findings are clearly erroneous, the appellate court should set them aside, always giving due regard to the fact that the trial court had the opportunity of observing the witnesses. In Simkins Federal Practice, 3d Ed., page 488, in commenting on the effect of Rule 52(a), it is said:

"The new practice, now incorporated in the Civil Procedure Rules, accords with the decisions on the scope of the review in modern Federal equity practice, and applies to all cases tried without a jury, whether legal or equitable in character, and whether the finding is of a fact concerning which the testimony was conflicting or of a fact inferred from uncontradicted testimony.

"Under the new practice, where findings are made by the court without a jury, the appellate court is not limited to the mere question whether there is any substantial evidence to support them, but may set them aside if against the clear weight of the evidence, at the same time giving full effect to the special qualification of the trial judge to pass on credibility."

■ The rule with reference to review of findings of fact in equity cases has often been announced by this court. Johnson v. Umsted, 8 Cir., 64 F.2d 316; Koenig v. Oswald, 8 Cir., 82 F.2d 85; Lambert Lbr. Co. v. Jones Engineering & Constr. Co., 8 Cir., 47 F.2d 74; Chicago, M., St. P. & P. R. Co. v. Flanders, 8 Cir., 56 F.2d 114; First National Bank v. Andresen, 8 Cir., 57 F.2d 17; United States v. Perry, 8 Cir., 55 F.2d 819. In Koenig v. Oswald, supra, we reversed the findings of the lower court in a fraud case because they were deemed to be contrary to the weight of the evidence, even though they were sustained by the spoken word from the witness stand. While the findings of fact are presumptive-

ly correct, they are not conclusive on appeal, if against the clear weight of the evidence. In Keller v. Potomac Electric Co., 261 U.S. 428, 43 S.Ct. 445, 449, 67 L.Ed. 731, the Supreme Court, in discussing procedure in an equity case, said: "In that procedure, an appeal brings up the whole record and the appellate court is authorized to review the evidence and make such order or decree as the court of first instance ought to have made, giving proper weight to the findings on disputed issues of fact which should be accorded to a tribunal which heard the witnesses."

The Supreme Court of Nebraska, in Re O'Connor's Estate, 105 Neb. 88, 179 N.W. 401, 12 A.L.R. 199, reversed the decision of the lower court, which admitted a will to probate after finding it genuine, on the ground that the testimony of the subscribing witnesses in support of the will was not credible although their positive testimony to the due execution was opposed only by oral evidence and evidence of a circumstantial character.

The facts largely relied upon in this case consist of testimony and written statements given or made by the defendants not in the presence of the lower court but in the course of the trial of the damage actions in the state court. The lower court, as to such evidence, had no better opportunity of judging the credibility of the witnesses than does the appellate court.

■ In considering the evidence, it is well to bear in mind that under the statute of Nebraska referred to as the Guest Statute, it is incumbent upon the Bonaccis to prove that the accident had been the result of Cerra's gross negligence. Nebraska Compiled Statutes Supp.1935, Sec. 39-1129. There was no liability if the accident was caused by ordinary negligence. Holmes v. Wesler, 274 Mich. 655, 265 N.W. 492; Fink v. Dasier, 273 Mich. 416, 263 N.W. 412; Cole v. Morse, 85 N.H. 214, 155 A. 694. The Supreme Court of Nebraska has also held that great care should be exercised by that court in weighing and analyzing the evidence in "guest cases." Belik v. Warsocki, 126 Neb. 560, 253 N.W. 689; Bonacci v. Cerra, 134 Neb. 588, 279 N.W. 314, 317. In the last cited case, in which the accident here considered was involved, the court said: "Owing to the degree of negligence necessary the guest statute presents cases new in character, and certainly involves characteristics peculiar to themselves. Almost invariably, the oc-

cupants of the car are either relatives or intimate friends, and consequently friendly to recovery. That the present case is not an exception to this rule plainly appears. 'Especially is this true in cases where an insurance company will be the one ultimately liable. Oftentimes even the defendant seems willing to stultify himself by confessing to wrongdoing that the plaintiff might prevail.' "

The Bonaccis and Cerra were friends in their native land. Both came to this country some years ago and the friendship formerly existing was here renewed and continued. As the invited guests of Mr. and Mrs. Cerra, the Bonaccis were returning from a vacation trip to Colorado. Mr. Cerra furnished the car and the necessary gas, oil and maintenance for the car at his own expense.

With these rules and circumstances in mind, we turn to a consideration of the evidence. Following the accident, the occupants of the car were all taken to a hospital at Grand Island, Nebraska. Immediately after the accident, Fred Griffen, in his capacity as deputy sheriff and in discharge of his official duty, went out to inspect the place of the accident and the damaged car. He found the car in the ditch at the left side of the road, examined the tires, and found the right rear tire flat with an eight or ten-penny nail in it. He describes the tire as being "plumb down." He then went to the hospital, where he saw Mr. Cerra and told him there was a nail in the right rear tire, and that "it went down, clear down flat." Two days later, a representative of the insurance company called on Mr. Cerra at the hospital for the purpose of securing a statement as to how the accident occurred and also for making up a proof of loss. He testified, and his testimony in that regard is undisputed, that he had talked with no one else with reference to the accident prior to his conference with Mr. Cerra. He also testified that Cerra said that the only thing he knew was that he had a flat tire, which caused him to lose control of his car and he went off into the ditch; also that the sheriff had informed him that there was a nail in the back tire. Based upon this information so received, the witness prepared proof of loss and a statement with reference to the manner in which the accident occurred. It stands without dispute that he included in the proof of loss the words that "the right rear tire had a large nail

in it." and this was also embodied in the statement. Cerra did not at that time sign the proof of loss and did not at any time sign the statement there prepared, but a few days later, after consulting a friend in Omaha, he signed the proof of loss (but not the written statement which had been prepared), eliminating from the proof of loss the words with reference to the nail in the tire. This proof of loss contains the following: "Was driving east on Highway No. 30 when my car swerved to the left and went off the road and upset several times in the ditch."

In his signed statement, which was prepared in Omaha at the time he signed the proof of loss, appears the following: "I was driving about 45 to 50 miles per hour. I do not recall what took place as all I remember I saw a bank in front of me. I do not recall a car coming toward me. I must have dozed for a second or two." This statement was signed about a week after Cerra's first interview with a representative of the insurance company and after he had consulted his friend in Omaha.

Cerra testified in the first case of Antonio Bonacci as follows:

"Q. And as you were traveling that way upon that road, could you tell the jury about how fast you were traveling? A. About 55 or 60, I guess.

"Q. As you were traveling that way, what happened? A. Well, it just happened that the car had got out of my control and went over in the ditch all at once.

"Q. What was the first thing that you knew that anything was wrong? A. Well, the first I knew *I had my hands on the wheel*, and the car turned over on the side, that's all; that is all I remember. (Italics supplied)"

In the same action, Mrs. Cerra testified that he was "just driving ordinary, there wasn't anything unusual about it to make you apprehensive at all"; that she did not recall anything unusual about the speed or the manner in which he was driving.

In depositions taken a year before the trial, in speaking of the movement of the car at the time of the accident, Antonio Bonacci said in part:

"Q. How far did it travel after the trouble started? A. I couldn't tell.

"Q. Well, did it travel a distance of a hundred feet after the trouble started?

A. Maybe it was more or less; I don't remember.

"Q. It may have been more than a hundred or may have been less than a hundred feet? A. Yes; I can't remember.

"Q. You knew when the car started to *weave that way,* and then all of a sudden it was all over; is that it? (Italics supplied) A. Yes."

Mrs. Bonacci's deposition was also taken and she testified as follows:

"Q. Do you know what went wrong with the car, or what happened? A. No, sir. I just saw when the car went like this and like this, you see (indicating).

"Q. Well, it just went on the paved road and then went off the left side of the paved road? A. Left side.

"Q. It didn't go out on the right shoulder and then come back or anything like that? A. No; just like this (indicating).

"Q. Well, how far did it go *as it was weaving that way,* as it was going back and forth, was it a hundred feet? (Italics supplied) A. I can't tell you."

In the first trial of the Angelina Bonacci case, which was the second case tried, and was tried a year and a half after the accident, Antonio Bonacci testified: "Well, I saw Mr. Cerra take his right hand from the steering wheel and reach something to his wife and then he lost control of the car and it go to the left side into the ditch." Further, that at this time Cerra "had his eye off the road and was looking at his wife." This was the first time either of the defendants in this suit made of record any such claim as to the cause of the accident.

The attorney for the insurance company then inquired of Mr. and Mrs. Cerra as to this testimony, whereupon Cerra said that he would say it was the truth, if he was asked about it. The insurance company then proceeded with the defense on the theory that the action was a frame-up on the insurance company.

Cerra, at that trial, testified as follows:

"Q. What caused you to lose control of the car? A. Well, when the occurrence of the accident, you know, Your Honor, as you go usually on the road, usually anybody—the gentlemen of the jury they probably know also—you might have a smoke or something. Now, I asked my wife to give me a cigarette and as I lit the cigarette the accident occurred and then I saw for certain I lost control and no way for me to avoid the accident.

"Q. That is, you reached over with your right hand for the cigarette? A. Yes; my right hand. I had the left hand on the wheel.

"Q. And your right hand off? A. The right hand was off, yes.

"Q. And at that time what speed were you making? A. Well, the average; you know, I go pretty speedy, sixty, seventy, and sometimes seventy-five, I don't recall, but at the moment I just don't recall the rate of speed I was going, but I was going pretty fast, but I don't recall the rate of speed.

"Q. Would you say that it was eighty miles an hour? A. I couldn't say.

"Q. And as far as you know there wasn't any flat tire on your car at that time just before it left the road? A. No; there wasn't anything wrong with the car all the way through.

"Q. The car was running along smoothly? A. Yes, sir."

Cerra first informed his attorneys of this alleged incident during the first trial of the Angelina Bonacci case, which was the second damage action tried. Plaintiffs' petitions in the Bonacci damage actions alleged excessive speed, but made no allegation to the effect that Cerra had taken his hand off the steering wheel. It was alleged that the car was driven at a rate of seventy miles an hour. In her own case, Mrs. Bonacci testified that Cerra took his right hand off the steering wheel and reached for something to his wife and "that was how the car went into the ditch."

█ The uncontradicted testimony of the deputy sheriff tends strongly to establish the physical fact that the rear right tire of the car was punctured by an eight or ten penny nail, and that the tire was flat. This witness was disinterested; his testimony is in no way discredited by other evidence and is not itself improbable. Commonwealth Life Ins. Co. v. Pendleton, 231 Ky. 591, 21 S.W.2d 985, 66 A.L.R. 1526; Gibson v. Womack, 218 Ky. 626, 291 S.W. 1021, 51 A.L.R. 773; International Shoe Co. v. Federal Trade Comm., 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431. If this was the cause of the accident, it would, of course, absolve Cerra from the charge of

418

gross negligence. Kelly v. Gagnon, 121 Neb. 113, 236 N.W. 160; Heesacker v. Bosted, 131 Neb. 42, 267 N.W. 177. But Cerra, although under the duty of actively cooperating in the defense of the actions, declined to sign a proof of loss or a statement which contained this information, and apparently did not wish to accept the benefit of such a defense. He also refused to sign answers pleading this defense, although he finally, on advice of independent counsel, did sign such answers. If, as later testified by him and the Bonaccis, Cerra took his hand off the steering wheel and reached over to his wife for a cigarette, and "had his eyes off the road and was looking at his wife," Cerra knew this fact better than anyone else, and he knew it from the beginning of the inquiry as to how the accident happened. Yet, when the company, as it had a right to do, called upon him for a written statement as to how the accident occurred, he made no disclosure of this alleged fact. If the accident in fact occurred in this manner, it was the duty of Cerra to disclose it at once to the representative of the insurance company. This alleged fact may well have determined whether settlement of the damage claims should be made. On the other hand, if this was not a fact, then Cerra was guilty not only of failure actively to cooperate in the defense of the actions, but was guilty of fraudulent conspiracy with his friends to enable them to recover against the insurance company.

The testimony of the Bonaccis with reference to the weaving movement of the car before it went into the ditch tends to prove another physical fact consistent at least with the existence of a flat tire. The new story is incredible, and we again observe that this was not testimony heard by the lower court, but was testimony given at the trials of the damage actions. It is significant too, that following the defeat in the first case, the nature of the evidence radically changed. The lighting of the cigarette and the taking of the hand from the wheel and the eyes from the highway, came into the evidence for the first time in the second case. When the jury returned a verdict for the defendant in the first case, it became apparent that what had been presented in that trial as a basis for recovery was insufficient to establish gross negligence on the part of Cerra. If, as is intimated, Cerra kept silent upon this fact in deference to the wishes of counsel, still

the Bonaccis were under no such restraint. The Bonacci's depositions taken a year before the trial of the damage actions and the statements signed by Cerra a year and a half before the trial, make no mention of any such occurrence. Even the attorney for the Bonaccis testified that he was not advised with reference to this alleged fact until after the trial of the first case, and hence, there was no pleading alleging any such negligence. There was such an inordinate persistency in repeating the various versions of the accident without any mention of these alleged facts, important, if true, until litigation established that something more was necessary, that a finding that they were the facts can not be sustained. As significantly said by the Supreme Court of Nebraska in Bonacci v. Cerra, 134 Neb. 588, 279 N.W. 314, 317, referring to this very litigation: "The foregoing record fairly discloses a course of litigation with peculiar progressive developments. In whatever aspect it may be viewed, it admonishes that great care should be exercised by this court in weighing and analyzing the evidence in this, as well as in all other 'guest cases'."

This construction of the statute by the Nebraska Supreme Court is binding upon us.

Referring now to the testimony of Cerra given on the trial of the instant case, it is putting it mildly to say that it abounds in contradictory statements and inconsistencies. Referring to his conference with the deputy sheriff, he, among other things, says: "This man told him that he had been out to the scene of the accident; he believes he mentioned something like there was a big nail in the right rear tire; he don't recall exactly what he says."

True, he also testified that he did not believe this man mentioned any nail in the tire to him at all. It is mildy suggested that Cerra told Ryan, the representative who interviewed him, that he took his hands off the steering wheel at the time of the accident. We find the following in the record referring to this first meeting with Ryan:

"Q. What did you tell him? A. Well, I told him that the car got off my control and run into the left side of the road to the ditch and we was all cut up, that's all I told him.

"Q. Did you tell him anything in addition to what you have already said as to how the accident happened, other than the

car got out of control and ran into the bank on the left side of the road? A. No, I never told him."

Again, referring to this same conference: "Q. Did you tell him at that time that you took your hand off the steering gear and were trying to light a cigarette, or anything like that? A. No, I don't say nothing to him, no."

Again: "Ryan asked him very few questions; he asked him how it happened, and he told Ryan that he was going too fast and the car got in the ditch."

Again: "He told Ryan the accident happened as he was speeding; * * * that he believes that he did tell Ryan that he took his hand off the steering wheel and was reaching for a cigarette and was lighting a cigarette and that then the car went off the road. * * * That he now wants to be understood as saying that the first man that saw him about the case, Mr. Ryan, that he told him that he took his hand off the steering wheel; that he 'believes' it was mentioned; that he told Connolly about it when he first met him over there; he 'guesses' he brought it up."

There was a second meeting between Cerra and Ryan, which took place in Omaha, and it is claimed that Cerra then told Ryan, and also Mr. Connolly, that he took his hands off the steering wheel at the time of the accident. This testimony is denied by both Ryan and Connolly, and it is significant that at that time Cerra signed the proof of loss from which he had eliminated the statement which disclosed that he had had a flat tire, indicating that he was carefully scrutinizing the statements which he signed. Under the terms of the policy, it was the duty of Cerra, if called upon, to make report in writing with reference to the cause of the accident, and that was the purpose of the written statement and the proof of loss which he in fact signed. As has been observed, neither of these makes any mention of his having removed his hands from the steering wheel, but in the written statement he says that he "must have dozed for a second or two." These statements contradict and are inconsistent with his testimony that he thinks or guesses that he told Ryan and Connolly about removing his hands from the wheel. Again, it is noted that in his testimony in the first damage action, he positively swore that "I had my hands on the wheel," and the testimony of his wife given at that trial, details what she observed at the time of the accident but makes no mention of the alleged incident of Cerra removing his hands from the steering wheel and reaching for a cigarette, and neither had the attorney for the Bonaccis heard anything of this alleged fact until after the trial of the first damage action.

■ Cerra is a party defendant in the instant case. There is no claim that he had made an honest mistake in his first testimony, nor was there any possibility of misunderstanding. According to his written statements, made when called upon to disclose the cause of the accident, and according to his testimony given in the first damage action, he did not take his hands off the steering wheel and his eyes from the highway. He must be bound by his own testimony and admissions against interest. A party can not in his own case, be heard by a court to deny today what he solemnly swore was true on yesterday, without some explanation or excuse. Steele v. Kansas City Southern Ry. Co., 265 Mo. 97, 175 S.W. 177; Harlow v. LeClair, 82 N.H. 506, 136 A. 128, 50 A.L.R. 973; Huff v. St. Joseph Ry., Light, Heat & Power Co., 213 Mo. 495, 111 S.W. 1145; Fowler v. Pleasant Valley Coal Co., 16 Utah 348, 52 P. 594.

The testimony of the Bonaccis taken by deposition, to which we have already referred, and the testimony of Antonio Bonacci in his own action in the state court, is proof that Cerra did not take his hand from the steering wheel at the time of the accident, and this testimony is subject to the same rule as that of Cerra, and when the testimony is "carefully scrutinized" and considered in connection with all the surrounding facts and circumstances, it is without probative force. The truth of the testimony of these three parties is disproved by their own sworn testimony.

■ The rights of the Bonaccis as against the insurance company are limited by and dependent upon the right of Cerra against the company. General Casualty & Surety Co. v. Kierstead, supra. They can acquire no greater rights, and if the conduct of Cerra has been such as to bar him from right of recovery under his policy, then the Bonaccis are likewise precluded from recovery. It is therefore not necessary here to consider further testimony of the Bonaccis on this phase of the case.

We are not impressed with the argument that the defendants were ignorant or illiterate. Cerra is thirty-seven years of age, was born in Italy, attended the public schools there, going through the second grade in schools which were limited to three grades. When twelve years old he came to the United States; he learned the tailoring trade, and he has been in business for himself for some fifteen or twenty years, making army officers' uniforms. He drives to the various army posts of the country, meets and transacts business with the army officers, displays his wares, takes their orders and makes their uniforms. He is a naturalized citizen of the United States, and is a successful business man. Antonio Bonacci is forty-seven years old, was born in Italy, but has been in this country for twenty-three years, living always in the city. He is a stonemason by trade, was educated in the public schools in Italy, and went to night school in Omaha. He is a naturalized citizen of the United States. The ability to narrate the facts of this accident did not require any special education or training, and there is nothing to indicate that either of these parties is lacking in ordinary intelligence. Though foreign born, they have lived in this country longer than in any other country. Fosnes v. Duluth Street Railway Co., 140 Wis. 455, 122 N. W. 1054, 30 L.R.A.,N.S., 270; Rahles v. J. Thompson & Sons Mfg. Co., 137 Wis. 506, 118 N.W. 350, 119 N.W. 289, 23 L. R.A.,N.S., 296.

By analogy, what is said by the Supreme Court of Maine in Medico v. Employers' Liability Assur. Corp., 132 Me. 422, 172 A. 1, 3, is here apposite. It is there said:

"Lack of co-operation may include fraud or collusion or may consist simply of refusal to act.

"In the instant case, the defense is based on comparison between a statement made to an investigator by the insured and testimony given by him in the trial of the tort cases, which it is alleged reveals inconsistencies and contradictions only to be accounted for by wrongful intent on the part of the insured. If the evidence warranted such a conclusion, fraud or collusion would be proven. The giving by the insured of intentionally false testimony, material in its nature and prejudicial in its effect, would be good ground for releasing the insurer from liability.

"It may be unimportant whether such a defense is denominated lack of co-operation or more properly described as fraud."

The judgment appealed from is therefore reversed and the cause is remanded with directions to set aside the judgment and enter judgment for the plaintiff adjudging no liability under the policy for this accident.