**FLEMING, Adm'r of Wage and Hour Division, Dept. of Labor, v. PALMER et al.**

**No. 3659.**

Circuit Court of Appeals, First Circuit.

Nov. 18, 1941.

Irving J. Levy, of Washington, D. C.
(Gerard D. Reilly, Leo L. Holstein, and Er-

win B. Ellmann, all of Washington, D. C., and Philip F. Herrick, of San Juan, P. R., on the brief), for appellant.

James R. Beverley, of San Juan, P. R. (Juan Enrique Soltero and Rafael Soltero Peralta, both of San Juan, P. R., on the brief), for appellees.

Before MAHONEY and WOODBURY, Circuit Judges, and HARTIGAN, District Judge.

MAHONEY, Circuit Judge.

The plaintiff, as Administrator of the Wage and Hour Division, United States Department of Labor, brought this action to enjoin the defendants from violating the provisions of the Fair Labor Standards Act of 1938, 52 Stat. 1060, U.S.C.A. Title 29, § 201 et seq.

The lower court refused to enjoin the defendants, Santiago R. Palmer, Magdalena J. Palmer and the Caribbean Embroidery Cooperative, Inc., with respect to members of the cooperative, but did enjoin the Caribbean Embroidery Cooperative, Inc., and not the defendant Palmers, as to non-members. It found as a fact that the cooperative was voluntarily formed, owned and controlled by the member-workers, who agreed to pool their labor and split the profits; and held that there was no employer-employee relationship as to members within the meaning of the Act.

No appeal was taken by the cooperative from the injunction granted against it. The plaintiff, however, has appealed from the refusal of the district court to enjoin the Palmers and the cooperative with respect to members of the cooperative. It is agreed that the cooperative and its members are engaged in the production of goods for interstate commerce. It is also agreed that the defendants have violated the wage-hour and record provisions of the Act, if it is applicable to them.

The plaintiff contends: (1) That the Act applies because an employer-employee relationship exists between the Palmers and the cooperative on the one hand and the members of the cooperative on the other, since in reality the Palmers control the business and the cooperative; and (2) that even if the workers control the business, still the Act applies to a member-controlled cooperative. The defendants contend: (1) that the cooperative is a "labor organization" within the meaning of Section 3(d) of the Act and thus exempt from its provisions;

and (2) that even though the cooperative may not be such an organization, the Act does not apply to them because the defendants are not employers, and the members are not employees within its meaning.

The case involves the applicability of Sections 3(a), 3(e), 3(g), 6, 7, 11(c), 15 (a) (1), 15(a) (2) and 15(a) (5) of the Act. The main issue is one of fact: Is this business controlled by the Palmers or is it controlled by the workers? If the cooperative is controlled by the Palmers then the simple, economic fact is that the members are working for the Palmers and hence are employees of the Palmers and the cooperative within the meaning of the Act. The district judge's finding that the business is controlled by the workers and not by the Palmers must stand unless it is clearly erroneous, due regard being given to the opportunity of the trial court to judge the credibility of witnesses. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. A finding of fact is clearly erroneous if it is against the clear weight of the evidence. It does not suffice that it be supported by evidence. Aetna Life Ins. Co. v. Kepler, 8 Cir., 1941, 116 F.2d 1; State Farm Mutual Automobile Ins. Co. v. Bonacci, 8 Cir., 1940, 111 F.2d 412; Manning v. Gagne, 1 Cir., 1939, 108 F.2d 718; Fed. Rules of Civil Procedure and The American Bar Institute Proceedings, p. 316 et seq. (Cleveland, 1938); Clark & Stone, Review of Findings of Fact, 4 U. of Chi.L.Rev. 190 (1937). In determining whether the finding was correct, we shall examine documentary evidence which we are as competent to consider as the trial court, testimony on which there is no conflict, and for the most part only the testimony of Palmer and Soltero, so that the element of credibility will not be seriously involved. This examination reveals the following history:

From 1931 or 1932 up until the day the Fair Labor Standards Act of 1938 went into effect, Santiago R. Palmer and Magdalena Juan Palmer operated and controlled the Caribbean Embroidery Company at 101 Calle Luna, San German, Puerto Rico, and manufactured handmade needlework products, particularly handmade handkerchiefs. Business was solicited from manufacturers and wholesalers through Julio Garcia in New York. The raw materials were sent from the United States to the company's plant in Puerto Rico, where the cloth was cut and stamped with a pattern. It was then distributed to women needleworkers

to embroider the handkerchiefs in their homes. The handkerchiefs were returned to the company where they were checked, repaired, laundered, ironed, folded and packed and then shipped back to the United States.

The Fair Labor Standards Act was approved by Congress on June 25, 1938, to become effective on October 24, 1938. Juan Enrique Soltero, a Puerto Rican lawyer, made a study of the Act and concluded that it would apply to the needlework industry as then set up in Puerto Rico, but that it would not apply if the industry were to be conducted by the workers themselves as the members of a cooperative. He discussed cooperativism with some employers in the industry, and the Sabana Grande Workshop of Mr. Jose Antonio Castillo was reorganized into a cooperative under Soltero's direction.

In June, 1938, Soltero discussed with the defendant, Santiago R. Palmer, head of the Caribbean Embroidery Company, the possibilities of establishing a cooperative.

Shortly thereafter Palmer informed the workers in his company of his conversations with Soltero and suggested that they hear Soltero "make a full explanation to them." Palmer advised the formation of a laborer's cooperative and told the workers "without menacing them" that they would be without work if they didn't form a cooperative.

On August 15, 1938, Palmer wrote to Julio Garcia, his New York agent, telling him that "we are taking the necessary steps to continue our business after the minimum wage law goes into effect" "but, naturally on the basis of dealing only and exclusively with me".[1] Meanwhile, Palmer also distributed a circular to his workers telling them it was necessary to form the cooperative to avoid the effects of the Act but that the cooperative would be dissolved when it should be no longer necessary for employers to meet the requirements of the Act.[2]

During this period of the formation of the cooperative, Palmer conferred with his workers "constantly", telling them that he would help them set up the cooperative.

[1] "On the same day, and in accordance with Castillo, I gave instructions to friend Soltero to proceed immediately to the organization of the Caribbean Embroidery Cooperative, a thing which has been agreed upon by Castillo and me to see whether, in this manner, we do not have to stop our work for even a single day.

"Inasmuch as this cooperative must be founded by the women workers of the shop, I am getting ready to have an interview with them tomorrow, Tuesday, and tell them of the advisability of this entire movement so that they may hasten the establishment of the cooperative, *but, naturally on the basis of dealing only and exclusively with me.*

"It would be very advisable for you privately to let the manufacturers who work with us know that we are taking the necessary steps to continue *our* business after the minimum wage law goes into effect. You should not extend this information to manufacturers who may have connections with other shops which may not be Castillo and I, in order to avoid their so advising their contractors and they in turn get a notion to do the same". (Italics supplied.)

[2] "Gentlemen:

"Everyone is acquainted with the law passed by the United States Congress applicable to Puerto Rico, which fixes a minimum salary of $2.00 a day during the first year and increasing each year, for the manufacture of articles which are exported for sale outside the state or possession.

"This law raises the cost of hand made goods to prices so high that it definitely kills the needlework industry in our island. It is an indisputable fact that all the shops of Puerto Rico are preparing to shut their doors the same day that the Federal wage and hour law goes into effect.

"Cooperatives and other entities as specified in the law are exempt from complying with this law.

"Until now there are no hopes nor movements real or encouraging for the destruction of the threat of death to our needlework industry. As a plank of salvation, we have called upon you to discuss here the advisability and the immediate organization of said cooperative, in order *to permit us to continue working under the conditions more or less as we are working at the present time.*

"If fortunately Puerto Rico in the near future becomes exempt from complying with the law, or the situation in the industry is arranged in any other way, *then the cooperative will be dissolved.* But do not forget that it is urgent to stop the shops from closing their doors, and to avoid having the American firms doing business in handwork made in Puerto Rico retire from the island and solve their problem in some other way. After everything is lost the arrangements or good laws that may come will not matter." (Italics supplied.)

At the same time Soltero was also constantly conferring with the workers and with Palmer. Soltero advised the workers to "get the laborers in a public place, all that could be assembled, and invite distinguished citizens, because I was convinced that this had to be done in an honest way, otherwise it could not be sustained".

The public meeting was arranged by a committee of workers composed of Elva Nazario Grant, head of the company's shipping department; Juana Gonzalez Negron, supervisor of the ironing and washing department; Gregoria Quinones Ramirez, supervisor of the cutting department; and Carmen Mujica Guzman. The meeting was held at the Teatro Sol in San German. About two hundred workers attended the meeting as well as distinguished citizens including the mayor, chief of police, a municipal judge, a member of the General Assembly and a representative in Congress. Very few home workers were present. Mr. Herman Alvarez, a druggist of San German, presided at the meeting.

At this meeting Soltero told the workers what a cooperative was and advised them that a cooperative "should be organized in the light of the Fair Labor Standards Act." He told them that in a cooperative "the laborers are owners and do not receive wages" and "the business would be for them". He urged them to "act as persons and not as slaves and not as things" and suggested that a vote be taken "to inquire about the results". Soltero testified:

" * * * A motion was passed whereby the assembly decided that according to the explanation I gave they were in sympathy with the organization of a labor cooperative. Then someone asked me what they should do. I suggested to them that the best way to proceed was the same way as we did in Sabana Grande, that it was impossible for them, so many people, to discuss the details of that problem because mass psychology would interfere and that they should select a delegation of persons in whom they had confidence and trusted with me and that in my opinion that committee should be composed of persons whom they thought most prepared."

Palmer testified that Soltero suggested each step of the way as the workers knew nothing about a cooperative.

Eight incorporators were chosen, one for each process of the business. They included the four persons who composed the committee to arrange the meeting, and also Camila Cardona Vega, supervisor of the stamping department; Rafael Juan Toro, a brother of Mrs. Palmer and supervisor of the office department; Juan Filiberty Velez, representative of the home distributors, and Santa Ramirez Jimenez. These incorporators represented the cutting, stamping, shipping, ironing, washing, office, folding and supervising, and home distributing processes, respectively. When the incorporators were selected, the stamping department had three employees; the office department, three; the cutting department, thirteen or fourteen; and the supervision and shipping departments, sixteen. The total number of workers inside the plant at this time did not exceed one hundred and forty. Filiberty represented eighty or ninety distributing agents. The home workers had no representative. While the Caribbean Embroidery Company at the time of this meeting employed more than three thousand workers, the total number of workers represented by the eight incorporators did not exceed two hundred and thirty.

There was very little testimony as to the precise powers given the incorporators by the vote of the workers meeting, the only evidence being that the incorporators were given the power "to talk to Mr. Soltero and have him prepare the Articles of Incorporation, and after they were approved by the Executive Committee or secretary[3] to immediately begin to accept applications for membership". Palmer addressed the meeting telling the assembly that the "cooperative was on the basis of the workers themselves" and that they would be the "absolute owners of the business". He also told them that he would help them if they appointed him as their manager. Soltero began to act as attorney for the workers after the meeting at the Teatro Sol. However, it was Palmer who agreed to guarantee payment of his account since the cooperative was without funds to pay for his services.

Soltero testified that he met with the incorporators and " * * * we began to work and it was a matter of long process,

[3] This apparently refers to the Executive Secretary of the Insular Government and not to any secretary or committee of the workers. See page 741 of the record.

nights and days and long hours, meetings in San German and Sabana Grande, meetings of both laborers, first explaining the theory of cooperativism and then discussing the application of these principles to the nature of the industry and then trying to put our reasoning in the form of articles of incorporation". He testified with regard to the drawing up of the articles of incorporation that "the main work, the mental creation, was mine". When he was working on the articles of incorporation and the by-laws, Palmer described the workings of the Caribbean Embroidery Company to him, though Palmer had not been selected by the proposed cooperative as its manager at that time. When the articles were completed, Soltero showed them to Palmer.

At a meeting of the incorporators held September 22, 1938, the articles were explained to the incorporators; Palmer testified that he didn't remember whether any of the incorporators asked any questions about them, but "conversation was held there among all of them". A needlework proprietor who attended the meeting stated that no questions were asked so far as he could remember. Without dissent, the incorporators agreed to the articles.

At a meeting held the next day, the incorporators unanimously elected Elva Nazario Grant, president, and Rafael Juan Toro, secretary-treasurer. The president then said that she believed Soltero's services would be necessary in the preparation of the by-laws, "a very technical instrument, which must be prepared by a person who knows cooperativism". The incorporators agreed to reduce to writing the contract for Soltero's services in preparation of the articles, the by-laws, and the contracts and other legal documents necessary for the organization of the cooperative.

Soltero then prepared the by-laws and Palmer read them. On October 22, 1938, there was another meeting of the incorporators at which the by-laws were read, discussed and unanimously approved by them. At the same meeting the incorporators accepted the "Bases of the Contract" which had been prepared by Soltero and which provided for a loan up to $20,000 from Palmer, the lease of Palmer's building and equipment, and Palmer's selection as mana-

ger. The minutes relate that Palmer "personally informs the Board that he is disposed to accept the 'Bases of the Contract' proposed, provided that the Board of Directors acquire by purchase the materials that he has for manufacture, and likewise that the Cooperative take over the orders for handkerchiefs that he has ready to ship, provided, however, that the Board believe that the prices at which he accepted said orders be reasonable". Rafael Juan Toro moved "the acceptance of the Contracts of Lease, Loan and Administration, and that by virtue of this, the said contracts should be in force and effect between the Cooperative as one party, and Mr. Santiago R. Palmer the other the same having to be made into a public writing subsequently". The motion was discussed and unanimously approved in Palmer's presence.

The articles of incorporation and the by-laws of the Caribbean Embroidery Cooperative, Inc., are long,[4] quite complicated, and in some instances confusing, and not altogether free from self-contradiction. The division of powers made therein bears directly on the issue whether this business is controlled by the Palmers or by the workers. For this reason, it is necessary to set forth the articles and the by-laws in some detail.

The place of business of the cooperative is the same as that of the Caribbean Embroidery Company. It has 2000 shares of capital stock of a par value of $10 each. Each member must subscribe to a share and must "promise to pay for it in accordance with the provisions of these By-Laws or in any other way that the Board of Directors may prescribe from time to time". No member is allowed to hold more than one share of stock, and when a member resigns or is expelled from the organization, the cooperative is bound to return to him the amount of money which he has paid on his share.

Whatever amount of money is left over after the expenses of the cooperative have been paid belongs to the members according to the quantity and quality of the work done by them, as determined by the board of directors. Members, however, have a right to weekly advances in anticipation of their share of the profits and whatever amount of profits has not been advanced to them in

---

[4] There are 50 articles of incorporation and 350 articles in the by-laws. Although the last article of incorporation is numbered 49, there are two numbered 38.

this fashion will be distributed to them at the end of the year.

If a member does not show the "cooperativist spirit", the board of directors, as well as any committee, officer or manager that may act in behalf of the board, "can take administrative action separating such member from the association". The expelled member may appeal administrative expulsion to the board, and from the board to the general assembly. The decision of the general assembly will be final, but the restored member "will have to fulfill all the requisites of a member in compliance with the Articles of Incorporation and the By-Laws."

The articles and the by-laws provide that each member is entitled to one vote, but he cannot vote until he has paid 25% of his subscription, i. e., $2.50, nor is he entitled to vote even though he has paid $2.50 if he is in arrears on his further payments. If he is in default because of "reasons beyond his control", the member may petition the Board for the right to vote, stating his reasons. The Board may accept or reject his reasons, and "In case the decision of the Board of Directors rejects the petition, the member shall be classified as not in good standing and cannot vote in the assembly".

Moreover, members who have been "expelled administratively from the Cooperative, although their cases may be in appeal, shall not have a vote. Neither can those members vote who though they have not been expelled from the Cooperative, are subject to a disciplinary procedure not yet decided administratively, because of a violation of the rules of discipline or any other rules, because his conduct has been in conflict with the fundamental purposes of the Cooperative". Nor is a member entitled to vote at the next General Assembly if he has lost his identification card or his share, [5] for it is provided that if either is lost, the member is not entitled to a duplicate until after the next Assembly and he "cannot claim any right" without the identification card or its duplicate, or the share or its duplicate.

There are to be no less than eight directors and each director shall represent one process of the industry. Directors are to be elected annually by a general assembly of workers to hold office for three years, except that the first board of directors is to be selected by the incorporators, of whom three shall hold office for three years, three for two years, and two for one year. Vacancies in the board of directors are to be filled by a majority vote of the board, [6] except that the board may ask the members of the process in which the vacancy has occurred to select a member for the position. The board, however, has the right to reject the person selected by the members of the process.

To be a candidate for the office of director, the member must be a member of the process which he proposes to represent, and he must be nominated by a majority of the members of his process.[7] Candidacies for the board shall be filed with the secretary who shall refer them to the committee on balloting. It would appear that a member cannot run for the board alone but must find a position on a "list of candidates". Moreover, the committee on balloting shall reject any list "of candidates which contains candidates not having the qualifications required for directors".

It is required that a director know how to read and write, and a majority of them must understand English and Spanish. Article 132 of the by-laws provides:

"Those with the greatest academic preparation will be preferred, preferably with high school and eighth grade education, or their equivalent, in addition to experience in the process they represent, ability to deal with persons, and good moral conduct."

Article 136 recites that the Board of Directors will be "the only authority to judge the conduct of the Directors." [8]

The manager, the assistant manager, the auditor and the legal counsellor shall have the right to attend meetings of the board of directors and shall have a voice but no vote.

A general assembly of the members of the cooperative shall be held annually, and special meetings may be held when requested by a majority of the board of directors or a majority of the members. To have a quorum it is required that there be

---

[5] A member is not entitled to a share until his subscription has been fully paid, but in the interim he is entitled to an identification card.

[6] But cf. Article 22 of the Articles of Incorporation.

[7] Every member of a process can participate in the nomination of a candidate to represent his process, even though the member is not entitled to vote in the general assembly.

[8] Article 136 would seem to be in conflict with Article 22 of the Articles of Incorporation.

present a· representative of each process, a majority of the members in a majority of the processes, and 5 per cent of the members of those processes not having present a majority.

The president must have a broad experience in the needlework industry, an education equivalent to at least two years of high school, and a knowledge of English and Spanish; but the president shall have no administrative duties.

The secretary shall keep the minutes, be custodian of all documents, shall certify all legal and financial papers, shall sign all share certificates and identification cards, and "shall decide ministerially the status of every member, but in cases of doubt, he shall submit, the matter to the Board of Directors for decision."

The treasurer is the custodian of the funds of the cooperative, and he shall keep an account of income and expenses and sign all checks together with the general manager.

"The General Manager must be a person who sincerely believes in the principles of cooperativism" [9] and he "may dictate disciplinary rules and regulations to maintain order and harmony among the members of the Cooperative". He "may act on his own responsibility, but he shall constantly consult the Executive Committee". Article 200 of the By-Laws provides:

"The Manager may act in representation of the Board of Directors in all matters that the Board of Directors may delegate to the General Manager, including the application of disciplinary measures, the distribution of work in different processes, the persuasion of members violating the standard of the Cooperative to abide by them and he is empowered to suspend them temporarily subject to the appellate proceedings provided by these By-laws."

He may appoint an assistant manager who may act in his absence, but the appointment is subject to the approval of the board.

The articles and the by-laws are not too clear with respect to the power to remove directors and officers, and the power to fill a vacancy after such removal. Article 19 of the Articles of Incorporation provides:

"When a vacancy may exist in the Board of Directors for any reason, the Board of Directors may fill the said vacancy in accordance with the provisions to be established in the by-laws . . ."

Article 22 of the Articles of Incorporation provides:

"A majority of the members of the Association . . . shall have power to remove from office any director or official, as well as to fill any vacancy caused by such removal . . ."

Article 136 of the By-Laws provides:

"The Board of Directors will be, within the functions of the Cooperative, the only authority to judge the conduct of the Directors and may decree the suspension of any of them . . ."

Article 149 of the By-Laws provides:

"Any officer can be removed from his position at any time by the affirmative vote of a majority of the members of the Board."

For the members to remove an officer or director, there must be favoring removal not only a majority of the total number of members, but also a majority of the members in a majority of the processes.

The members have the right to amend the articles if the petition for amendment is "signed by at least 10% of the members corresponding to a majority of the processes of the industry to be established by by-law; and which in any case shall be no less than eight processes". We are unable to determine the precise meaning of this provision. For passage of the amendment it is required that there must be in favor of it a majority of the members of the cooperative, plus a majority of the members of two-thirds of the processes, with the majority of the process being computed on the basis of those present, but the majority of the association being computed on the basis of those who have a right to vote whether present or not. In any event, Article 46 of the Articles of Incorporation provides:

"If a proposal for amendment in a given case, in the opinion of the directors, should be of such importance as to require additional and careful study, the Board of Directors may decide when considering the same not to submit the proposal to the next

---

9 It should be noted that Manager Palmer in his circular to the workers said that the cooperative would be dissolved as soon as it was no longer necessary for employers to meet the requirements of the Fair Labor Standards Act of 1938.

General Assembly, but to leave the said proposal for a subsequent assembly."

With respect to the power to amend the by-laws, Article 339 of the By-Laws provides:

"The Board of Directors may amend from time to time these By-laws, by the affirmative vote of two-thirds of its members, after report from the Committee of Rules. The General Assembly of members may also amend these By-laws following in effect the proceeding prescribed in Section XXV."

Section XXV is not clear in its meaning.

The by-laws lay down the rules on the procedure to be followed in meetings of the general assembly, and with respect to the amendment of these by-laws, Article 131 provides:

"The procedures of the Assembly shall be governed by these By-Laws and in the cases not covered by the principles of parliamentary procedure, generally acknowledged, these By-Laws cannot be totally or partially suspended unless it is by unanimity."

While the meaning of this article is not altogether clear, it would seem to mean that in order to change the procedure for the conduct of the general assembly as outlined in the by-laws, a unanimous vote of the assembly is required.

The cooperative shall have the following committees to be named by the board of directors: an executive committee, a committee on discipline, a committee on credentials, a committee on charges, a committee on balloting, a committee on rules. Article 230 of the By-Laws provides:

"The functions and duties of the different committees are later specifically explained, besides those to which the By-laws refer in different provisions. Such functions shall be carried out by the Committees, coordinating them with the functions of the Manager so that the functioning of the Committees may not come into conflict with the rules and disciplinary regulations of the Manager, to guarantee order and efficiency in the shops; for this purpose, the Committees, upon reaching any decision shall put it into effect through administrative channels, that is, submit the case to the Manager for him to handle it."

Article 231 provides that in case the decision of a committee conflicts with the decision of the Manager, the decision of the Committee shall not prevail, but the matter shall be submitted to the Board of Directors.

The executive committee is to be composed of the president, a director, a member not a director, and the secretary.

Article 234 provides:

"The executive committee shall function in cooperation with the Manager and shall be the permanent representation of the Board of Directors to the Manager."

However, "the Executive Committee may not make decisions that would obligate the Manager"; but the executive committee may advise, and may "give its approval to the Manager, when the latter requests it".

Article 240 of the By-Laws provides:

"Among the powers of the Executive Committee, that of intervening whenever the Manager might request it is specifically granted, in the approval jointly with him of orders for work, of distribution of work, in conformity with the By-Laws. The final acceptance in the name of the cooperative of any order for articles that are to be manufactured shall be always a function of the Manager within the limits of the By-Laws."

The committee on discipline is to be composed of the president, the secretary, and a director to be appointed by the board. The committee may not meet if the manager is not present, but Article 245 provides:

"The Committee on Discipline may act by itself, without the presence of the Manager, when it proceeds to investigate insubordination in the cooperative, providing that it shall not take the initiative in investigations of that nature except upon reference of such cases to it by the Manager."

The decisions of the committee will not bind the manager. It may prepare disciplinary rules with the approval of the manager, "but such disciplinary rules will not take effect until they are approved by the manager". The manager may suspend members, but his decision may be appealed to the board and finally to the general assembly. "The rules of discipline proclaimed by the manager on his own initiative * * * shall be in force so long as they are not annulled or modified by the Manager, by the Board of Directors, or by the General Assembly of members."

The committee on credentials shall be composed of the secretary, a director and

a member not a director. This committee "shall decide if any member or members have or have not the right to vote * * *." The committee on balloting may reject lists of candidates for the board of directors if the list contains a candidate unqualified for the board in the judgment of the committee.

If there is not sufficient work for all the members, "the Manager shall establish rules of preference in the distribution of work." However, Article 304 of the By-Laws provides:

"The Board of Directors shall dictate, from time to time, supplementary rules for the distribution of work and the Manager shall also issue instructions so that the distribution of work may be made as equitably as possible among the members with the purpose of carrying out the principles for which the organization was created."

By the "Bases of the Contract", Palmer agreed with the cooperative to lease his buildings, valued at $20,000, for an annual rental of $1,200 (6 per cent of $20,000), and his equipment, valued at $5,000, for an annual rental of $300 (6 per cent of $5,000).

He agreed to loan the cooperative up to $20,000 at 6 per cent interest. He also agreed to serve as manager for which he was to receive 10 per cent of the gross income of the business. The valuation of the building and equipment was not ascertained by an independent appraiser or real estate expert but by a committee including Palmer's brother-in-law, which accepted the cost figures submitted to it by Palmer.

The contract of management provides that either party may rescind the contract, giving thirty days' notice, and "in case of rescission whether it be by virtue of the initiative of the Administrator or of the Board of Directors, all of the debt owing in the loan contract will become due and the Administrator will assume exclusive jurisdiction of the management and administration of the management of the cooperative until the total liquidation of the debt".

On October 24, 1938, the day on which the Act went into effect, the Caribbean Embroidery Company ceased to manufacture hand-made handkerchiefs. It was succeeded by the Caribbean Embroidery Cooperative, Inc.

Palmer told the customers of the cooperative in the United States that he would be personally responsible for making the goods or for any loss or damage to them sustained in the process of manufacture. Every decision of the manager was approved by the executive committee and there was not a single instance of a decision by the manager being overruled by the committee. One of the members of this committee was Mr. Miguel Laracuente. His selection for the committee is described in the minutes:

"Mr. Miguel Laracuente takes the floor and states his desire to be a member of said Committee. He states that even though his residence is out of town where it is hard to get in touch with him for meetings which are so often held by said Committee, he would agree to the holding of meetings without his presence and would approve all agreements taken at said meeting.

"Miss Elva Nazario Grant nominates Mr. Laracuente for member of the Executive Committee. The nomination is seconded by Delia M. Saez and is approved by the Board unanimously. * * *"

Every action of the manager which called for approval by the board of directors was approved unanimously. The minutes also report that every matter ever considered by the board was passed unanimously. The manager and the legal counsellor attended almost every meeting of the Board, and meetings were adjourned almost without exception if they were not present.

Despite the fact that the by-laws provided that the homeworkers should have a representative on the board of directors, and despite the fact that the board approved the admission of such workers to membership on December 10, 1938, almost no homeworkers were admitted to membership until November or December of 1939, more than a year after the formation of the cooperative. Palmer had felt that the cooperative was not required to meet the Fair Labor Standards Act with regard to these workers, because he thought they were employees of the distributors. Once it was realized that they might be considered employees of the cooperative, a drive was made to have them join as members.

In March, 1940, only twenty members out of a membership of 1335 owned fully paid shares. At the time of the trial, it

was estimated by the secretary-treasurer that fifty to sixty workers owned fully paid shares, and the manager thought that no more than ten of the 1,200 homeworkers had paid the $10.

In September, 1940, ten or eleven months after the admission of the homeworkers to membership, only "100 to 150 more or less of the homeworkers" had paid the $2.50 required for the right to vote, according to Palmer's testimony. It was said that the reason for this was the later admission of these members to the cooperative.

The annual general assembly of members was not held until February 10, 1940, fourteen months after the formation of the cooperative. Only 183 members out of a membership of 1,335 were entitled to vote at this assembly and only 116 of them exercised the right to vote. With the exception of the folding process directorship, there was no contest for any of the positions on the board of directors. There was no vacancy in the supervision process and in the cutting process because the original incorporators had chosen Elva Nazario Grant to serve for two years and Carmen Mujica Guzman to serve for three years. The balloting committee studied the "different candidacies" and recommended:

Office: Rafael Juan Toro
Washing: Mrs. Julia Toro
Ironing: Mrs. Paula Alvarez
Folding: Misses Milagros Porrata and Santa Alvarez.

Those were the only names that appeared on the official ballot as candidates for these processes. As no candidates had been named for the stamping, homework and distributing processes, these nominations had to be made at the general assembly.

The cooperative used the same buildings and equipment as the old company. It was financed by the same source; employed the same operating method and had largely the same personnel doing the same work. The earnings of the workers remained practically the same; the New York agent was the same. As Palmer said: "The business is continued and still continues almost the same as before the cooperative was established".

We now come to the main issue. Is the district judge's finding that the workers and not the Palmers controlled this business clearly erroneous? While we are reluctant to upset findings of fact, still a close examination of the record has led us irresistibly to the conclusion that this finding is against the clear weight of the evidence and must be set aside.

It is true that no particular piece of evidence is decisive of the issue of control, but considered as a whole the evidence compels a finding that Palmer controlled this cooperative. He actively participated in the organization of the cooperative for the express purpose of avoiding the Fair Labor Standards Act. This fact is not an element bringing him within the scope of the Act, but his motive does have some probative value on the issue of control for it shows that he was actuated not so much by a desire to benefit his workers as by fear of loss to himself. He told his workers that they would be without work if they did not form a cooperative; that he would aid them in its formation; and that it would be dissolved when it became no longer necessary for him to meet the requirements of the Act. He wrote to his New York agent that the cooperative was being formed "naturally on the basis of dealing only and exclusively with me." Thus he spoke as a man who had the power of life and death over the cooperative and could dictate terms to it.

Nor can there be any doubt that he has such power. He holds the workers in a state of economic subservience because they have been told that their livelihood is dependent on the continued existence of the cooperative, and they know that he can deal it the death blow at any time by rescinding the contracts and proceeding to the liquidation of the large debt owing him. He need not have fears of independent action on the part of members because he can disenfranchise any member or any number of members at any time. The right to vote is gone if Palmer suspends the worker for failure to display the "cooperativist spirit" or, indeed, if he merely says that the worker is "subject to a disciplinary procedure not yet decided".

It should be noted that the Puerto Rican workers for the most part are poverty stricken and possess little bargaining power. Report on Puerto Rico: The Needlework Industry, prepared by the Research Statistics Branch of the Wage and Hour Division for the Special Industry Committee for Puerto Rico, and cited in de-

fendant's brief. Many of them are also illiterate.

The vital positions in the actual conduct of the business of the cooperative are manager, assistant manager, and secretary-treasurer. Palmer is manager. His wife is assistant manager. His brother-in-law is secretary-treasurer, and a member on the board of directors, the executive committee, the committee on discipline and the committee on credentials.

Nor can the organization of the cooperative be ignored. Palmer and a lawyer, who had already reorganized one Puerto Rican business on a cooperative basis, worked in conjunction with a small group of higher-paid employees who arranged a meeting which was attended by only 200 of the 3,000 workers. Very few homeworkers were present. The meeting voted that it was in sympathy with cooperativism and at the lawyer's suggestion that "mass psychology" be eliminated, eight incorporators were selected. They were not chosen generally from the workers; rather, each process nominated its own representative. The office department with only three workers and represented at the meeting solely by a brother-in-law of Palmer, was given as much representation on the board of incorporators as the tweney-five hundred homeworkers. So also were the cutting department with fourteen employees and the supervision and shipping departments with sixteen employees. As a matter of fact, even though the homeworkers, by far the largest and most skilled group of workers, were entitled to one representative, actually none was selected.

The eight incorporators were given authority "to talk to Mr. Soltero and have him prepare the articles of incorporation, and after they were approved by the executive committee or secretary [of the Insular Government] to immediately begin to accept applications for membership." The articles of incorporation and the by-laws, based on data supplied to the lawyer by Palmer, were then drawn by the lawyer and approved by the incorporators. Approval of the articles and the by-laws by the workers was never gotten, despite the fact that they contained carefully drawn provisions regulating the distribution of powers, the right to vote, powers of amendment and election and removal of directors and officers—all calculated to leave control in a very small group which was most naturally inclined to be friendly to Palmer.

The incorporators gave themselves the power to name the first board of directors, with three of the directors to serve for three years, three for two years, and two for one year. By naming themselves they were entrenched firmly in office, for even if the workers were given an unqualified right to vote, it would take two years before they could elect a majority of the board. At the time of the first assembly, when the cooperative was under investigation by the Wage and Hour Division, only two directors held over by reason of this provision. Nevertheless the power existed.

The incorporators also qualified the right to vote. No member can vote until he has paid $2.50 to the cooperative, and even if he has paid $2.50, his right to vote is lost, if he should fall in arrears on his promise to pay the full $10, unless the board of directors is satisfied with the member's reasons for his delinquency in payment. The right to vote at the next general assembly is gone if the member should happen to lose his identification card or share. Furthermore, the member is disenfranchised if the manager suspends him or says he is "subject to a disciplinary procedure not yet decided". Fourteen months after the cooperative was formed only 183 members had the right to vote.

And for whom can a member vote for the office of director? He can vote only for persons nominated by each particular process, even though that process might contain as few as three workers. Nor is that all. He can vote only for those persons who have been approved as candidates for the board of directors by the committee on balloting which is named by the incumbent board and given the power to disapprove any candidate who doesn't display the "cooperativist spirit". In this manner the board controls to a very great degree the selection of the successor board.

The power of the members to amend the articles of incorporation, which they have never approved, is completely negligible. Any amendment can be blocked by the relatively small number of members who compose the smaller processes and, in addition, the board of directors can stop any amendment merely by saying that it requires further study. When it comes to the question of the power of the mem-

bers to amend the by-laws the provisions are so confusing and complicated that it is impossible to tell precisely what the members' rights are in this regard. One thing, however, does appear to be fairly clear: if the members wish to amend the procedure of the general assembly, if they want to change the rules for the conduct of the one meeting where they are supposed to exercise their "right of control", they must get a unanimous vote for the amendment. Palmer's brother-in-law is a member of the general assembly and could veto any amendment of this character.

There are many more objectionable features in the articles of incorporation and the by-laws but we have considered enough of them. It suffices to say that a reading of them can lead only to the conclusion that this cooperative is a far cry from the cooperative of which the late Justice Brandeis was thinking when he said in Liggett Co. v. Lee, 288 U.S. 517, at page 579, 53 S.Ct. 481, at page 501, 77 L.Ed. 929, 85 A.L.R. 699:

"But Americans seeking escape from corporate domination have open to them under the Constitution another form of social and economic control—one more in keeping with our traditions and aspirations. They may prefer the way of co-operation, which leads directly to the freedom and equality of opportunity which the Fourteenth Amendment aims to secure. That way is clearly open. For the fundamental difference between capitalistic enterprise and the co-operative—between economic absolutism and industrial democracy—is one which has been commonly accepted by Legislatures and the courts as justifying discrimination in both regulation and taxation."

The defendants emphasized the role of the executive committee in the conduct of the business of the cooperative, but not in a single instance did that committee overrule a decision of Palmer. The manner in which that committee operated and the view which the board of directors took of that committee is indicated by the fact that the board unanimously elected Miguel Laracuente a member of the committee after he had stated that he might not be able to attend many meetings, but that he would approve anything done by the committee. Like the executive committee, the board of directors has unanimously approved every decision of Palmer which they were called upon to approve. Indeed, an examination of the minutes in the record reveals a remarkable unanimity on every matter that ever came before the board.

It is interesting to note the following comments of Israel Packel, an authority on the law of cooperatives:

"A practical expedient * * * is the practice of keeping the actual number of members very small at the outset. * * * This practice does have a danger which should not be overlooked."

" * * * If it is proposed to give the directors the power to change by-laws, more guarantees for the protection of all the members should be written in the charter."

"If the voting power of members is not exercised there results the same evils of management control which exist in many large business corporations with many widely scattered shareholders."

"The difficulty with such a method of voting [selection of directors on a territorial basis] is that the directors often feel they represent their own territory rather than all the members of a cooperative."

"A disadvantage of such staggered terms [in the selection of directors where the incorporators name the first board] is that it might take two years or more for a majority of the members to elect a majority of the directors."

"A third type of committee, and one which is fraught with danger in a cooperative, is the executive committee."

Packel: The Law of the Organization and Operative of Cooperatives (1940), pp. 54, 58, 93, 94, 107, 116.

Here the actual number of members was kept small at the outset for the homeworkers were not admitted to membership until November or December, 1939. The directors were given the power to amend the by-laws, and the charter is not distinguished by guarantees for the protection of all members. Many members do not have the right to vote, and of the one hundred and eighty-three entitled to vote at the first assembly only one hundred and sixteen voted. We also have directors nominated according to processes, staggered terms for a board of directors named by the incorporators, and an executive committee.

A thorough study of the record has disclosed that Palmer possessed extraordinary powers. Whatever powers he might possibly have lacked were lodged in the group of employees most naturally inclined to be favorable to him. The history of the formation and operation of the cooperative, the

articles of incorporation and the by-laws do not reveal an industrial democracy governed by workers. We have been forced to conclude that the district judge's finding that the workers and not the Palmers controlled the business and this cooperative is against the clear weight of the testimony and must be set aside.

 We are fully aware of the fact that there are many cooperatives which attach financial conditions to the right to vote and which are nonetheless controlled by the members. There are member-controlled cooperatives which have been formed originally by a small group of incorporators who approved the articles of incorporation and the by-laws and constituted themselves the first board of directors. We are also cognizant of the fact that the articles of incorporation and the by-laws of the Caribbean Embroidery Cooperative, Inc., have received the approval of the Puerto Rican authorities under the Puerto Rican Cooperative Law. Whether the requirements of the Puerto Rican Cooperative Law are met is a different issue from the issues of control and of the applicability of the Fair Labor Standards Act of 1938 here involved. Moreover, the attachment of financial conditions to the right to vote, and incorporation by a small group of men close to an employer, are definitely relevant on the issue of control, even though considered by themselves they may not be decisive.

We hold that Palmer controls the cooperative and these workers. The economic fact is that they are working for him. The method of paying the workers does not weaken this conclusion. The Fair Labor Standards Act of 1938 is applicable to the business of this cooperative, as it has been set up and operated in this case, for Congress in passing the Act was dealing with economic realities.

 The Act is a remedial one and must be liberally construed. Bowie v. Gonzalez, 1 Cir., 1941, 117 F.2d 11. The definition of "employ" in Section 3(g) of the Act is very broad, namely, "to suffer or permit to work". There exists here an employer-employee relationship within the meaning of the Act between the Palmers and the cooperative on the one hand and the members on the other hand. It has been stipulated by the defendants that they concede violation of the wage-hour and record provisions of the Act if the Act be found applicable to them. It follows that the judgment of the district court must be reversed and that an injunction issue against Santiago R. Palmer, Magdalena J. Palmer and the Caribbean Embroidery Cooperative, Inc., restraining them from violating Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Act.

 Since the Palmers control this business, the cooperative is not a "labor organization" within the meaning of Section 3(d). Because of the view which we take of the case, it is unnecessary for us to pass upon the government's contention that the Act is applicable to a cooperative which is controlled by its members.

 Before the printing of the record the plaintiff moved the court to strike certain portions designated by the defendants and to dispense with the printing thereof "for the reasons that their inclusion in said record violates Rule 75(e) of the Federal Rules of Civil Procedure [28 U.S.C.A. following section 723c], as well as Rule 14, par. 5 of the Revised Rules of this Court; * * * or, in the alternative, to require the defendants to pay the cost of printing the said portions of the filed record on appeal". We allowed the printing of the designated portions of the record leaving until the hearing on the merits the question whether the cost of printing these portions should be assessed against the defendants on the ground that they burden the record with repetitious, unnecessary and irrelevant matter. The motion is denied. To determine the question whether the business was controlled by the defendants, or by the workers, it was necessary to consider the entire history of the organization in all its phases, and we do not feel that we can say that the matter to which the plaintiff objects is so repetitious, unnecessary or irrelevant that the defendants should be taxed with the cost of printing those portions of the record.

The judgment of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.