DORENE LARSON, APPELLEE, V. LEROY STORM, APPELLANT.

289 N. W. 792

FILED JANUARY 19, 1940. No. 30719.

*Clyde R. Worrall, Cook & Cook* and *Wear, Boland & Nye,* for appellant.

*Schiefelbein & Donato* and *McKenzie & Dugan, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

PAINE, J.

This is an action for personal injuries in an automobile accident, the plaintiff being the guest of the defendant. The first trial resulted in a mistrial. The jury returned a verdict for the plaintiff for $3,500 on the second trial, and the defendant appealed from the judgment entered upon the verdict.

The plaintiff and defendant resided on farms not far from each other. The plaintiff was a rural school-teacher, 20 years of age, and the defendant a young farmer, 23 years of age, and they had been keeping company for something over a year, attending various social functions together. They went to a dance at Memphis, in Saunders county, in his 1930 Model A Ford coupé on Saturday night, and the accident occurred early Sunday morning, January 9, 1938, in returning from the dance. Memphis is about ten miles

from plaintiff's home. The accident occurred about six miles therefrom.

At the time of the accident, as they were traveling east on an ordinary country road, they went down a slope some 220 yards to a wooden bridge 71 feet long, and at the end of this bridge the road immediately curves slightly towards the north, and beyond that a large concrete pipe goes under the road for drainage purposes as a culvert, and the ends of it projected out on each side of the road. The bridge was old, had two railings on each side, and had been repaired by putting in at least one new plank, which projected a short distance above the planks on either side of it, where the wheels had worn down the older planks.

The defendant's testimony was to the effect that he was going 35 to 40 miles an hour, and struck this new plank, and that this caused a blow-out in the right front tire, and the two right wheels ran off the road and ran along in the ditch. He attempted to bring the car back up into the road, but failed, and in jerking the car the plaintiff was thrown out of the car when defendant struck the end of this cement pipe. Both the plaintiff and defendant testified they heard no noise of a blow-out.

The plaintiff testifies that, as they were leaving the dance, defendant suddenly became angry at a man and whirled around to face him, knocking the plaintiff down with his elbow, but, before the men got to fighting, Kris Kalb, the uncle of defendant, stopped the quarrel. In returning from the dance they followed Mr. Kalb's car, which was going about 35 to 40 miles an hour, but after several miles, when they reached the top of the hill, the defendant increased his speed, and ran around his uncle and went down the hill. The plaintiff complained, and said she told him he was driving too fast, and should slow down; that she said this in a loud voice, because she was frightened. She testified that the defendant turned his head, and kept looking at her as he crossed the bridge at 50 to 55 miles an hour; that he failed to make the slight turn at the end of the bridge, and lost control of the car, and the wheels on the right side

went down about two feet toward the ditch; that his speed was not slackened, and when the right front wheel hit the end of the projecting cement pipe the car bounced up, the door flew open, and she was thrown out onto the frozen ground and injured. She testified that defendant picked her up, laid her on the seat of his car with her feet hanging out, while he went to get his uncle, Kris Kalb, who came, and they lifted her into his car, and she was taken home. She said she screamed with pain as they took her in the house, where she remained until January 21, when she was taken to the Bryan Memorial Hospital in Lincoln, where X-rays disclosed a badly fractured pelvis and sacrum, the bones being splintered and having slipped over each other. Her hips were placed in a canvas belt with weighted pulleys attached, in which she remained eight weeks, according to the testimony of Dr. Charles Arnold. In three and a half months she was able to walk, and to resume her teaching position.

Kris Kalb testified that he was an uncle of the defendant, and lived about six miles from the plaintiff. He testified that the new plank in the bridge did not project over a quarter of an inch above the old planks; that early the next morning he went down to where defendant's car was, and that there had been no blow-out, as the front tires were not down when he got there. He said the hood was thrown about eight or ten feet from the car.

An expert tire man brought a spreader before the court, and showed the jury that there was a defect on the inside of the tire, but it was not a blow-out in the usual and accepted use of that word. The expert admitted that, if it had been a blow-out and then ran 280 feet on hard, frozen ground, the tube would show many cuts, whereas the tube showed no cuts.

Plaintiff testified that the defendant said to her after the accident, "If anything happens to you it's all my fault because I thought I was smart passing my uncle." The defendant denies this.

The defendant testified that there was a blow-out on the

right front tire when it hit the new plank in the bridge, which was two inches higher than the old planks. He was not supported by the other evidence on these points. He testified it was about 66 feet from the bridge to where the car stopped against an old tree stump. Other evidence indicated it was 280 feet.

As to the use of intoxicating liquor, plaintiff testified that when they arrived at the dance they both had a pint bottle of beer, and that she had no more, but did not know whether he got more when he went downstairs several times with the other men. The defendant testified that he had one more bottle of beer. The mother of the plaintiff testified that she detected very strong liquor on his breath when he brought the daughter home, that he acted "dumpy," and would not talk. The father of the plaintiff at once accused him of drinking, and defendant admitted he had some beer. In leaving the dance, as detailed above, the defendant had an altercation with another man, which nearly resulted in a fight.

In spite of all this evidence in reference to the defendant drinking, the court gave instruction No. 18, as follows: "The jury is instructed that there is no competent evidence offered by the plaintiff to sustain the allegation in her amended petition that the defendant was intoxicated or under the influence of intoxicating liquor at the time of said accident. That issue has been withdrawn by the court." This instruction was instruction No. 2 offered by the defendant, and given in a slightly modified form by the court.

Defendant, for reversal, assigns the alleged error of the trial court in overruling defendant's motion for a directed verdict in his favor at the close of plaintiff's evidence, and again at the close of all the evidence. He also assigns as error the refusal to give instruction No. 1, requesting an instructed verdict. Further error is charged in overruling defendant's motion for a new trial.

This action is governed by the Nebraska guest statute, being section 39-1129, Comp. St. Supp. 1939, the first sentence of which reads as follows: "The owner or operator

of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire, unless such damage is caused by the driver of said motor vehicle being under the influence of intoxicating liquor or because of the gross negligence of the owner or operator in the operation of such motor vehicle."

The defendant cites all of the recent decisions of this court in which plaintiff has failed to recover in personal injury cases resulting from automobile accidents, and from them argues that there can be no recovery here. We will examine several in which judgments have been recovered.

In *Black v. Neill,* 134 Neb. 764, 279 N. W. 471, the defendant turned his head to the left and pointed out a tree which had blown down upon a porch, forgetting about the stop sign on Grace street. To make the stop, he applied the brakes so suddenly that the plaintiff was thrown into the windshield of his car and injured. It was stated in the opinion that turning the head, taking the eyes off the road, under some conditions and circumstances might constitute gross negligence.

In *Morris v. Erskine,* 124 Neb. 754, 248 N. W. 96, it was held: "Gross negligence * * * means negligence in a very high degree, or the absence of even slight care in the performance of a duty." See, also, *Heesacker v. Bosted,* 131 Neb. 42, 267 N. W. 177.

In our opinion, the case of *Sterns v. Hellerich,* 130 Neb. 251, 264 N. W. 677, is closely in point. Four young folks were late, and in hurrying to get to a weiner roast went over the top of a hill at 50 to 55 miles an hour, and did not slacken speed, and crashed through the side of a bridge. The driver was warned that there was a bad place at the bridge. We said in that opinion: "Adolph was driving the car at night on a curving road down a steep hill and approaching a narrow bridge, of which he was aware, at a speed of 50 miles an hour, when he had been warned that there was a dangerous place in the road ahead. He chose to disregard the warning and continued the reckless driving,

with the disastrous results indicated. We think that, under the circumstances, the question of gross negligence was one for determination by the jury."

Other Nebraska cases which we believe will support a verdict in the case at bar are: *Howard v. Gerjevic,* 128 Neb. 795, 260 N. W. 273; *Kovar v. Beckius,* 133 Neb. 487, 275 N. W. 670; *Gilbert v. Bryant,* 125 Neb. 731, 251 N. W. 823; and the cases involving the Iowa guest statute, *Bailey v. Bryant,* 127 Neb. 843, 257 N. W. 241, and *Jennings v. Biurvall,* 122 Neb. 551, 240 N. W. 757.

"Gross negligence, within the meaning of these statutes, has been variously defined—as 'the want of slight diligence,' as 'an entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the things and welfare of others,' and as 'that want of care which would raise a presumption of the conscious indifference to consequences.'" 5 Am. Jur. 635, sec. 241.

"The continued or protracted failure of the operator to maintain a proper lookout along the road ahead of his vehicle may constitute gross negligence." 4 Blashfield, Automobile Law (Perm. ed.) 129, sec. 2327. See, also, *Kaley v. Huntley,* 333 Mo. 771, 63 S. W. (2d) 21; *Richards v. Richards,* 86 N. H. 273, 166 Atl. 823.

In a case in which the driver of the car negligently turned her head away from the road, and was looking in a direction almost opposite to which she was traveling, it was held that a directed verdict for the defendant should be reversed, as such conduct and inattention amounted to gross negligence. *Pitcher v. Curtis,* 43 Ga. App. 622, 159 S. E. 783.

We have set out the substance of the evidence, which was conflicting, but on which the jury found against the defendant on the questions of fact and returned a verdict for the plaintiff.

The question of gross negligence is for the jury where the evidence relating thereto is conflicting, and from which reasonable minds might draw different conclusions. If plaintiff warned the defendant to drive more slowly and, in dis-

regard of such warning, defendant lost control of the car, this would be one of the facts which the jury could consider in determining whether gross negligence existed. The district judge seems to have conducted this trial with great care, and to have protected the defendant in all the rights to which he was entitled. We have held many times that, where the evidence was conflicting, a verdict of a jury based thereon will not be disturbed unless it is clearly wrong. We find no prejudicial error which would warrant a reversal of this judgment, and the same is

AFFIRMED.

CARTER, J., concurs in the result.