MERLIN OLSON, APPELLEE, v. THOMAS SHELLINGTON, APPELLANT.

94 N. W. 2d 20

Filed January 9, 1959. No. 34448.

*Budd B. Bornhoft* and *Healey, Davies, Wilson & Barlow,* for appellant.

*Harry N. Larson* and *Wear, Boland, Mullin & Walsh,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This appeal is from a judgment in favor of appellee for damages resulting from injuries sustained by him while a guest in an automobile operated by appellant in a manner alleged by appellee to have been grossly negligent. Appellant tested the sufficiency of the proof to warrant a verdict for appellee at the completion of his case-in-chief and again after the final rest of the parties, and each of the motions was denied. The verdict was for appellee and judgment was accordingly rendered. A motion by appellant for judgment notwithstanding the verdict or, in the alternative, for a new trial was denied. This appeal is a challenge of the correctness of the action and conclusion of the district court.

The assignments in this court are that the trial court erred in denying each of the motions of appellant for a directed verdict in his favor; in submitting the case to the jury because of the absence of evidence of gross negligence of appellant in any of the respects charged; and in denying the motion of appellant for judgment

notwithstanding the verdict or for a new trial. The substance of these is that the evidence fails to sustain a finding adverse to appellant on the issue of gross negligence. They will be so considered in the disposition of the appeal.

The tragedy resulting in this litigation occurred on the night of June 29, 1952. Appellee, who had then completed his second year in high school, was 16 years of age. Appellant, who had just finished his junior year in high school, was then 17 years of age. They, Bill Griggs, and Charlie Swenson were members of the Junior American Legion baseball team of Wakefield where they resided. The ball team was to engage in competition with another baseball organization in Wayne on the date above stated, and the four of them and Gerald Meyer, who was not a member of the baseball team, departed from Wakefield in an automobile operated by appellant in the early evening of that date for Wayne. They proceeded west from Wakefield on a road which intersected Highway No. 15 at which place they turned south and continued until they arrived at their destination. This part of their sojourn was uneventful. They, except Gerald Meyer, participated in the ball game and soon thereafter at about 11 o'clock they, except Bill Griggs who had made other plans, were ready to commence the return trip from Wayne to Wakefield.

They elected not to follow the route they did on the trip to Wayne but to travel what is referred to in the record as the Seventh Street road. Its course from Wayne was due east 8 miles where it intersected a road 2 miles south of Wakefield on which they expected to finish the return trip. The Seventh Street road was described as a better-than-average, fairly smooth, solid, dry, dirt road. It was frequently intersected by other roads and was quite hilly in places. There was a hill of moderate elevation slightly more than one-fourth of a mile west of the place of the accident which is the subject of this litigation. It leveled off to the east some

800 to 900 feet west of the site of the accident and from there to the bridge where the accident occurred the road was generally on the same grade as the bed or floor of the bridge. The road west of the bridge was 20 feet wide. It extended due east and west until it came near to the west side of the bridge which constituted a part of the road. The bridge was 6 miles east of Wayne. It was on a 45 degree angle from southwest to northeast and was in fact the intersection of the Seventh Street road and a north-and-south road. The road from the south intersected the road from the west at the southwest end of the bridge. The bridge because of its position on an angle would have been directly in the course of each of the roads if they had been extended and continued in a straight course. A traveler proceeding on the road from the west if he continued in a straight course to the east when he came to the bridge, would have struck the railing on the right-hand or southeast side of the bridge as he proceeded towards the east. It was because of this that as the road from the west approached very near to the bridge, it sharply curved to the northeast so that entry on the bridge by a traveler from the west could be made at the southwest end of the bridge. The bridge was not easily visible to a traveler from the west until he was quite near it. It was estimated that the bridge could be seen by such a traveler when he was from 100 to 200 feet from it.

The bridge was a concrete structure 25 feet wide, and 28 feet long. It had a concrete floor. There was a railing on each side made of channel iron the length of the bridge and each was fastened to 5 metal standards set in cement. A 12-inches-wide, 3-inches-thick, 20-foot-long standard bridge plank was placed along the inside of the right-hand railing of the bridge, extending from the southwest corner of it toward the northeast. It was fastened to the railing and also a metal post near the southwest corner which supported a bridge-capacity

plate or marker. The top of the plank was about 3 or
3½ feet above the floor of the bridge at the southwest
end and it decreased in height toward the northeast
until that end of it rested on or near the floor of the
bridge. The floor of the bridge was covered with dirt,
the railing was unpainted and badly rusted, and the
plank was unpainted and weather-beaten. Each of these
blended into the color of the road and was not easily
distinguishable. There had been prior accidents on
this bridge. The right-hand railing had been forced
outward and downward. It was afterwards straightened
up to some extent but it was not in good condition.

There was a bridge-capacity sign or marker on a
metal post 3 or 3½ feet high at the southwest corner
of the bridge near the southwest end of the southeast
railing of the bridge. It was a reflector type of sign or
marker and it would reflect a red color and shine at
night if a light shown on it. There was on the marker
"10 TON CAP." The headlights of an automobile if they
were a proper height from the surface of the road
would illuminate the marker when the car was about
300 feet from it until the car approached and came to
the location of the sign. It faced the southwest in an
attempt to be visible to travelers approaching it from
the west and from the south. It was estimated to be
4 inches wide by 6 inches long or 4 inches wide by 8
inches long. The long way of it was perpendicular.
Probably because it was on an angle, it appeared smaller
than it actually was. It was said that it appeared to be
about 2 inches wide to a traveler on the highway. There
was evidence that the marker was there in place as it
had been for 2 or 3 years on the afternoon of June 28,
1952, which was the day before the accident.

The occupants of the automobile when it left Wayne
on the return trip were appellant who operated it, ap-
pellee in the back seat was to the right, to the left of
him was Charlie Swenson,. and Gerald Meyer was to the
right of appellant in the front seat. They continued

that seating arrangement until the accident. Appellee had never traveled the Seventh Street road between Wayne and Wakefield or any part of it except 2 miles immediately east of Wayne. He depended on appellant as the driver of the automobile. The weather was pleasant and dry. It was clear but quite dark.

Appellant lived at Wakefield within 4 miles of the place of the accident all his life. He hunted in that territory with his father and went by the bridge at least once each hunting season. He had been on the intersection where the bridge was, knew where it was, and had gone over it at different times. Appellant accompanied an employee of his father on a trip made in a pick-up truck owned by his father from Wakefield to Wayne on the Seventh Street road across the bridge in the daytime about 1 week before the accident. The return trip was made over the same route and across the bridge by them that day. It was not shown that appellant had operated any vehicle on that road or the bridge before the time of the accident. There was no condition or thing which interfered with vision on the return trip except the natural darkness of the night. There was no other traffic. Appellant did not pass or meet any vehicle and he saw no vehicle approaching on any side road.

The road was not entirely straight or level all the way. There were hills on a part of it. Appellant did not as he drove east that night anticipate any turns in the road ahead of him. When the automobile was coming out of Wayne and until it crossed the railroad track about one-fourth of a mile east of the city the speed of it was about 25 miles per hour. Its speed was increased from there to about 45 to 50 miles per hour and that speed was generally continued to the place of the accident. Appellant was compelled to have his foot on the accelerator of the car to attain and sustain that speed.

The lights on the car were operating and were on high

beam.   Appellant responded to an inquiry as to how far ahead he could see that he did not know but he could see as far as his headlights.   In answer to a question as to how far that was he stated he never paid any attention and that he did not know.   He later said he could see ahead approximately 25 feet with his headlights on bright.   He said he understood feet and yardage, that he knew 25 feet were 8⅓ yards, and that when he testified about 25 feet he knew exactly what he wanted to be understood to mean.   When he came down the last hill about one-fourth of a mile west of the place of the accident onto the lower or level part of the road he continued toward the bridge with his foot on and was using the accelerator of the car and had a speed of 45 to 50 miles per hour.   As he traveled to the place of the accident he said he did not see the bridge-capacity sign at the southwest corner of the bridge though he was looking ahead down the road and it looked clear. He was driving straight ahead with a clear front windshield, both hands on the steering wheel, and possibly talking to the boys in the car.   He noticed nothing peculiar about the road and continued to go straight ahead, not seeing the curve in the road, onto the bridge at the same rate of speed until he suddenly saw an object immediately in front of the automobile within a very close distance which turned out to be the bridge but he said it looked like a plank someone had put across the road in front of him as maybe a joke or prank.   Appellant could not stop and the accident happened.

The automobile traveled toward the east with its south or right-hand wheels about 2 feet inside the southwest corner of the bridge.   A wheel track was found which was 23 inches inside the southwest corner that extended to the southeast edge of the bridge.   The bridge plank above described was struck and broken in pieces.   The bridge railing outside of the plank was displaced.   The post on which was fastened the capacity marker was bent.   The automobile went off the south-

east side of the bridge, traveled through space to the east for 45 feet, struck the bank on the far side of the creek, and made and left a hole in the bank. It was a big hole, the making of which required a terrific force. The hole in the bank was directly in line with the wheel track found on the bridge. The hole in the bank was only 5½ feet below the level of the floor of the bridge. The distance from the floor of the bridge to the bottom of the creek was about 8 feet. The automobile turned over and landed on its top 42 feet from where it contacted the east bank of the creek. It came to rest in the creek 85 feet from the bridge measured on a direct line from where it left the bridge to where it came to rest. Appellee thereby sustained injuries which have resulted in total permanent disability.

There is evidence tending to establish the truth of each of the matters recited above. The evidence concerning material matters in this case is conflicting but the circumstances of the cause require that in considering and deciding the sufficiency of the proof to sustain a verdict for appellee on the issue of gross negligence, the evidence relating to it must be viewed most favorably toward appellee, controverted matters must be resolved in his favor, and he must have the benefit of any reasonable inferences deducible therefrom. Werner v. Grabenstein, 165 Neb. 231, 85 N. W. 2d 297. It is because of this that only the proof tending to establish the existence of gross negligence is included in the foregoing recitation and that contradictory evidence has been disregarded.

An issue of gross negligence must be decided from the facts of each case. Such an issue is for the jury if the evidence relating thereto is conflicting and from it reasonable minds might arrive at conflicting conclusions. When the evidence is resolved most favorably to the existence of gross negligence and thus the facts are determined, the inquiry of whether or not they support a finding of gross negligence is one of law. A guest to

recover damages from a host for injury received by a guest while riding in an automobile operated by the host must prove by the greater weight of the evidence that it was the proximate cause of the injury. Gross negligence within the meaning of the motor vehicle guest statute means gross and excessive negligence or negligence in a very high degree. It indicates the absence of slight care in the performance of duty. Werner v. Grabenstein, *supra*. Gross negligence within the meaning of the guest statute has also been defined as an entire failure to exercise care or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the safety of others. Larson v. Storm, 137 Neb. 420, 289 N. W. 792; Gummere v. Mudd, 139 Neb. 370, 297 N. W. 622. A finding of gross negligence is justified if there is evidence of imminence of danger known to the operator of an automobile, continuous negligent operation thereof, and that the operator of the automobile was heedless of the consequences which might ensue by the negligent operation of it consisting not only of rate of speed but of other conditions known to the operator which enhanced the peril. Werner v. Grabenstein, *supra*.

The fact that appellee or any of the other passengers in the automobile did not complain of or warn appellant of danger in his manner of operating the vehicle before the accident has been the subject of frequent mention. Appellee had not been over the road and had no knowledge of the existence, location, or condition of the bridge or of any hazard it presented to travelers attempting to use it. Appellant had superior knowledge in this respect and was charged with knowledge of the bridge and the danger of imprudent operation of an automobile to and across it. Appellee could not have been expected to warn appellant concerning something about which appellee had no knowledge and in reference to which appellant had information because of his past experiences at and near the bridge. It is not indispensable

to establish gross negligence that it be shown that protests by the guest or others were made to the operator of an automobile of his conduct or omissions prior to the time of the accident. Lemon v. Hoffmark, 132 Neb. 421, 272 N. W. 214; Black v. Neill, 134 Neb. 764, 279 N. W. 471.

The specifications of gross negligence pleaded by appellee include the charge that appellant failed to maintain a proper lookout and to observe the turn in the road at the bridge in time to have avoided the accident; that he failed to have the automobile under proper control and to drive it so as to follow the turn in the road onto the bridge and thereby have avoided driving off the side of the bridge; that he operated the automobile at an excessive speed of 45 to 50 miles per hour under the circumstances present; and that he operated the automobile without sufficient lights. There was evidence supporting each of these charges of gross negligence. The failure of the driver of an automobile to maintain a proper lookout along the road ahead of him when driving at high speed in the nighttime on a country road with a restricted lighted distance ahead of him is an important consideration in deciding whether or not gross negligence existed as a proximate cause of the accident. Larson v. Storm, *supra*; Gustason v. Vernon, 165 Neb. 745, 87 N. W. 2d 395. It is the duty of a driver of an automobile at night on a highway to proceed so that his headlights will mark out the traveled road. Olson v. County of Wayne, 157 Neb. 213, 59 N. W. 2d 400; Shields v. County of Buffalo, 161 Neb. 34, 71 N. W. 2d 701. The fact that the course of the automobile continued directly to the east from where it left the traveled portion of the road until it struck the railing and went off the bridge and that there was no evidence of an attempt of the operator to turn it to the left or to stop it is convincing that the driver was oblivious to the situation until the accident was inevitable and probably until it happened.

Appellant attempts to justify the speed at which he was driving the automobile before and at the time of the accident as within the statutory limits and therefore lawful. The speed of an automobile may be unlawful even though it is within the statutory prima facie limits if it is unsafe or is greater than is reasonable or prudent under the existing conditions. § 39-7,108, R. R. S. 1943; Carlson v. Hanson, 166 Neb. 96, 88 N. W. 2d 140.

It was a proper consideration for the jury as to whether or not the speed of the automobile was unsafe, unreasonable, imprudent, and grossly negligent under the existing conditions as shown by the evidence. More than one act of negligence may in combination amount to gross negligence within the guest statute. Paxton v. Nichols, 157 Neb. 152, 59 N. W. 2d 184.

The evidence is sufficient to sustain a finding of imminence of danger known to appellant because of the location, condition, and situation of the bridge; the condition of the lights of the automobile; and a course of negligent acts and omissions in the operation of the automobile without regard to the consequences that might be and were promptly inflicted upon the guest. The proof permitted the jury to find an absence of slight care in the performance of duty by appellant and such a failure by him to exercise prudence and care as to justify a conclusion that there was an indifference to the safety of his guest. The court properly submitted this case to the jury.

The judgment should be and it is affirmed.

AFFIRMED.