MILLARD I. HESS, APPELLEE, v. FRANK HOLDSWORTH,
APPELLANT.

127 N. W. 2d 487

Filed April 10, 1964.   No. 35560.

Ivan A. Blevens, for appellant.

Kier, Cobb & Ludtke and Beynon, Hecht & Fahrnbruch, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

The plaintiff and appellee, Millard I. Hess, brought this action against the defendant and appellant, Frank Holdsworth, in the district court for Lancaster County, Nebraska, to recover for personal injuries received in a one-car accident while riding as a guest in an automobile owned and operated by the defendant.

The plaintiff will be referred to as such or as Hess, and the defendant will be either so designated or by his last name, Holdsworth, throughout this opinion.

Plaintiff's petition alleged he suffered injuries while riding as a guest in an automobile owned and operated by the defendant occasioned by the grossly negligent and careless acts of the defendant: In failing to maintain proper observation; in driving at a grossly excessive rate of speed under the existing conditions; in wholly ignoring plaintiff's protest and continuing to so drive; in failing to heed warning signs and stop signs; and in utter disregard of the character of a "T" intersection of which he knew.

Defendant's answer, insofar as becomes significant

herein, consisted of a general denial; an allegation that plaintiff while a guest in defendant's automobile was injured in the accident; and allegations that at the time defendant properly operated his motor vehicle at a lawful rate of speed but was unable to stop it at the stop sign by applying his brakes because of a blowout of the right front tire. It further alleged the assumption of risk by the plaintiff and contributory negligence on his part: In riding with defendant with whose driving habits, including that of driving at the maximum lawful rate, he was familiar; in participating in purchasing alcoholic liquors for and consuming them with defendant which impaired his driving reactions and responses though defendant was not intoxicated; in not leaving defendant's automobile when he had an opportunity to do so knowing the defendant was tired and had consumed such liquors; and in failing to maintain a proper lookout knowing the defendant's said condition, or to warn defendant of his approach to the intersection, or to object to the speed of the automobile under the circumstances.

Plaintiff's reply was in substance a general denial.

At the trial in district court, the defendant made a motion for a directed verdict or a dismissal at the conclusion of plaintiff's evidence, and again at the close of all the evidence. The jury returned a verdict for the plaintiff and judgment was entered thereon. Defendant's motion for judgment notwithstanding the verdict or for a new trial being overruled, he has brought the matter to this court by appeal.

We will now review the evidence as disclosed by the record.

State Highway No. 2 runs east and west where the accident occurred and it is joined there by State Highway No. 43 which enters it from the south forming a "T" intersection. Traffic on Highway No. 2 is favored at that point and a stop sign is present at the southeast corner of the intersection requiring vehicles on Highway

No. 43 to stop before entering Highway No. 2. The accident happened October 14, 1961, some time after 11 o'clock at night. Immediately before the accident, the defendant had been operating his 1955 Ford sedan northward on Highway No. 43. The plaintiff was riding on the front seat beside him. Shortly before, they had left a tavern about ½ mile south of Bennet, Nebraska, which village lies 2 miles to the south of the scene of the accident. The road runs straight north from the tavern through Bennet and on to the intersection.

A state trooper, Del Whitefoot, who was called to the scene of the accident, testified on behalf of the plaintiff. His investigation took place between 11 and 11:30 p.m. He gave a description of the area and measurements made by him. Both highways have paving 24 feet wide. Highway No. 43 to the south was level as was Highway No. 2 to the west, but the latter slopes down to the east. The weather was good at the time and the highways were dry. Besides the stop sign at the southeast of the intersection, there was a warning sign approximately 1 block south. There was also a reflectorized sign north of the intersection on the extention of the centerline of Highway No. 43 with arrows pointing to the east and west. There is a sodded shoulder about 10 feet wide on Highway No. 2 immediately north of the intersection. North of the shoulder the ground slopes down for 3 or 4 feet into a little hollow or gully from which it slopes upward to the north ending in a bank. From the edge of the pavement to the bank it is 22 feet in all. There is no obstruction to the view from the south to the warning sign, stop sign, or reflectorized sign.

The officer arrived 20 or 25 minutes after the accident. He found the 1955 Ford four-door in the dead end to the north of the intersection facing slightly to the northwest with its right corner or front pressed 1 to 1½ feet into the bank. The right-hand side of the car was open. Defendant Holdsworth was down on the

floorboards of the car. Plaintiff Hess was lying on the front seat with his feet hanging out the door. Hess was semiconscious and he mumbled slightly but could not be understood. Holdsworth was unable to speak. Both were later removed by ambulance. In helping to move them, Whitefoot detected the odor of alcoholic liquor on the breath of each. There were several 7-Up bottles in the car, perhaps three or four empty and three or four full. At least two were not opened. The bottles as well as the interior of the car smelled of alcohol. There was an empty pint whisky bottle with the cap on, and a full fifth bottle of whisky, cracked but the contents as yet not spilled and with the seal unbroken. Holdsworth was taken to St. Elizabeth Hospital at Lincoln, and there, at the officer's request, a body fluid specimen was taken from him. The result of the test was 0.12.

Four distinct skid marks led to the defendant's vehicle. They were measured by the officer with a tape and were 121 feet long. They were four solid marks with no evidence of a tire becoming flat before leaving the highway. The right front tire was flat where the car had stopped. It was pressed into the bank. There were wheel marks in the grass on the shoulder where the skid marks ended. For 5 feet thereafter there were no such marks which indicated to the officer the car was apparently in the air a short distance. On this type of Ford, braces go to the bumper. They are heavy pieces of steel 2 inches in width and $\frac{3}{8}$ of an inch thick, and the two trusses extend to the front of the bumper. One brace was buckled and the other partially so.

A week later the officer interviewed the defendant at the Veterans Hospital to which he had been transferred. Defendant said that the night of the accident he was going for something to eat and that he and Hess had been to Bennet where they had a few drinks. When asked how much they had to drink, defendant said two beers. During questioning he said he did not know whether beer had anything to do with the accident, that

he thought he had gone to sleep and on crossing the highway had awakened and tried to apply the brakes but it was too late. He said the speed of the car was about 50 miles per hour. There was no defect in the vehicle and he made no claim as to there having been a blow-out. When the trooper asked if he did not think he was going 75 miles per hour, defendant answered he did not think that fast. When the skid marks were mentioned and the officer again suggested the circumstances indicated greater speed, he just hung his head. Pictures of the car in evidence indicated damage to the front end. The officer pointed out from them other damage under the carriage and to the right side. There was none behind the front door post.

Orren L. Graves, assistant to the chief of police of the City of Lincoln, testified. He gave his qualifications as one who had studied and received special training in determining minimum speed from skid marks. He had made tests in many types of cars. Neither the tread on the tires nor the weight of the car made any appreciable difference. At the request of plaintiff's counsel, he had tested a 1958 Ford Fairlane on this particular intersection. If the pavement were clean and had no gravel on it, he found at this intersection that the minimum speed of a vehicle to lay down 121 feet of skid marks was 48 or 49 miles per hour.

The only witnesses to the accident or the happenings of the day leading up to it are the parties themselves. The plaintiff and defendant had known each other for many years. They lived only 2 miles apart and had been friends. Plaintiff had ridden with defendant 20 or 30 times. They had gone out evenings together. On other occasions they had had drinks together. Their evidence in the cause before us is conflicting in several material respects.

The plaintiff was a married man, 44 years old at the time of the trial on April 29, 1963. When the accident occurred he was living near Bennet, Nebraska, on a farm

operated by his father and brother. He was in World War II and was allowed a total disability pension which arose by reason of a nervous and not a physical condition. He did farm chores and took care of the garden and livestock, but was not employed otherwise. His version of what happened before the accident was related on the witness stand. About 6:30 or 7 o'clock he went to the defendant's home in his Model A Ford for the purpose of dealing for a butcher hog. The defendant told him he wanted to go to Palmyra, which is 7 miles northeast of Bennet, to buy a fifth of whisky for bowling on Sunday, and asked plaintiff to go with him. After defendant was cleaned up, they drove to Palmyra arriving there about 8 p.m. They both went to a tavern that serves tap beer and each had one glassful. Then they went to the liquor store and plaintiff bought a pint of Sunnybrooke whisky and paid $3 for it. The defendant bought and paid for a fifth of whisky but no 7-Up. They opened plaintiff's pint in the car and plaintiff took a swallow and defendant took a drink. They had no mix or chaser. The lid was then put back on the bottle. He did not drink any more of the whisky nor did he see the defendant drink any more of it. Holdsworth then drove the car to a tavern ¼ mile south of Bennet. He did not drive dangerously nor carelessly. At Bennet plaintiff played pitch for a couple of hours. Before playing he got a bottle of beer. Defendant went with him to the bar but they did not drink together. Defendant did not play with him at any time and plaintiff did not go where Holdsworth was though he saw him there with a number of others. Plaintiff had but one bottle of beer while playing. When the card game broke up about 10:30, he went over where the defendant and others were. He asked one, Bill Thomas, to take him home. The defendant became angry and said he had brought plaintiff and he wanted to take him home. About 10:30 p.m. defendant said he would take the plaintiff to Eagle to get steaks. Holdsworth did not ap-

pear drunk or boisterous. The plaintiff got in the car. They had no more to drink. Defendant "started out alright" and drove north through Bennet at 35 to 40 miles per hour. There were no cars ahead or behind. Holdsworth began thereafter to drive faster and faster. At the cemetery, plaintiff said, "Better slow down, Frank." He was then driving 75 to 80 miles per hour and plaintiff told him he was going too fast. Later he again said, "Slow down, Frank," when they were going 80 miles per hour. Then they came to the corner where they went straight on and ran in the ditch. Defendant made no exclamation of any kind about a tire blowing out and the car did not weave as if one had blown out. The car did appear to go over on the left side of the road a little bit. Plaintiff looked ahead and saw the bank and that is the last thing he remembered. Holdsworth did not apply the brakes or attempt to slow down when told he was going too fast.

On cross-examination, plaintiff's story remained substantially the same with respect to the actions of himself and the defendant concerning the obtaining of liquor, what and how much each party drank, and their actions throughout the evening. With respect to the defendant's driving before the accident, the substance of his evidence on cross-examination is here given. Holdsworth did not appear under the influence of liquor and plaintiff did not feel any such effect. Plaintiff noticed that Holdsworth was driving too fast before they got to the cemetery north of Bennet. Plaintiff could not see the speedometer because it was dark at the time. The car was driven faster and faster. Plaintiff had never ridden with Holdsworth when he had driven that fast. The car was not weaving and his fears and complaints arose from speed. Defendant was driving up to 80 miles per hour. He could tell about how fast Holdsworth was going. Plaintiff believes he felt the brakes go on when they were close to the stop sign.

The defendant, Frank Holdsworth, was a single man

30 years old at the time of the trial. He lived with his father and mother. His parents operate a 320-acre farm near Bennet. He had worked during the day repairing the corn crib and picking corn. About 2:30 in the afternoon he drove the tractor into Bennet to have the tire fixed. He had one beer at the tavern there and saw Hess playing cards but they did not converse together. He went home about 4 o'clock and worked until 7 o'clock. Hess came about 7 o'clock and stayed while he ate, shaved, and cleaned up. Hess suggested going to his place to do the chores and then going to Palmyra to get a pint of whisky to drink. Defendant drove to Palmyra. They went to the liquor store and Hess bought the pint and defendant bought a fifth and a 6-pack of 7-Up. They were there about 10 minutes. They went to the car and put the fifth under the front seat. Hess opened the pint and both took a pretty big drink. They did not open any 7-Up bottles. Then they went to the tavern which was a block south and each bought two glasses of beer and each drank two. It took them about half an hour to drink the two. When they left the tavern, they got in the car and opened two 7-Up bottles before starting the car. They drank about half of the mix and each filled up his own bottle with whisky. This they both drank after they started driving, and then they stopped and had another refill. It took them half an hour to drive the 9 miles from Palmyra to Bennet. When they got to Bennet there was about one-fourth of the bottle left. They both went to the tavern at Bennet, getting there about 9 o'clock. Hess bought two bottles of beer. Holdsworth sat at the bar and drank his and Hess started playing cards. Defendant saw Hess with a bottle of beer at the card table and was sure he drank two because Holdsworth had bought him another. Holdsworth was drinking beer while there. They both stayed until 11:15. Defendant went to the outside toilet at 11:15 and Hess came out and said, "Let's go to Eagle and get something to eat." Defendant said it was too

late because they close at 12 o'clock. They both stopped at the car and drank the whisky and killed the pint. Hess was going to buy a T-bone and said he did not care, the next day was Sunday. They did not open defendant's fifth of whisky. He bought this for bowling as the bowlers took turns buying whisky and it was his turn. When Hess got in the car it was 11:20. Defendant drove through Bennet and on north on the new asphalt road. They had nothing further to drink. Defendant drove about 55 miles per hour. Defendant's condition with reference to the effects of beer and alcohol was fair. He was not completely intoxicated but it had an effect on him. As they drove along they talked as friends about farm matters. Defendant saw the stop sign. He knew where it was anyway, having lived in the community all his life. He could see it for ¼ mile. He slowed up a bit as he approached it but did not apply his brakes too hard. About 150 feet from the stop sign he heard something like a tire blowout and it seemed as though the wheel pulled the car to the west, or left side. Then they hit the dead end. Thereafter he came to in St. Elizabeth Hospital and was later transferred to Veterans Hospital.

On cross-examination the defendant was questioned in respect to his testimony given in a deposition taken September 20, 1962. In the course of this interrogation, the defendant admitted stating in the deposition: That a couple of other "guys" had helped drink up the pint of liquor and that plaintiff and defendant had only a couple of "shots," or about half of it; that what they drank was before they arrived at Bennet and neither drank whisky thereafter; and that the most he had at Bennet was two or three beers. He further stated in the deposition that, "When that guy killed that pint then we just threw that pint outside." He said this other person was a neighbor whose name he did not know. He testified that his answers to questions in the deposition,

which constituted the substance of the testimony here related, were true.

The various errors assigned will now be discussed. The defendant assigns as error to the trial court the overruling of the defendant's motions for a directed verdict or dismissal at the conclusion of plaintiff's case and at the close of all the evidence, and in overruling the defendant's motion for judgment notwithstanding the verdict. He contends the verdict is not supported by the evidence and is contrary to law. These several assignments all relate to the sufficiency of the evidence to submit the plaintiff's case to the jury and will be discussed together. The question was raised before the trial court by the motions to direct a verdict or dismiss the cause. The basis of the motions were that the evidence as a matter of law failed to show gross negligence on the part of the defendant; that it did show as a matter of law that the plaintiff was guilty of contributory negligence more than slight in buying liquor for and drinking with the plaintiff; and that plaintiff assumed the risk of riding with the defendant as a matter of law under the circumstances.

This court has laid down certain rules in decisions concerning gross negligence attributable to the parties in such cases. In Landrum v. Roddy, 143 Neb. 934, 12 N. W. 2d 82, 149 A. L. R. 1041, this court held: "The question of the existence of gross negligence must be determined from the facts and circumstances in each case. * * *

"A violation of statutes regulating the use and operation of motor vehicles upon the highways is not negligence per se, but evidence of negligence which may be taken into consideration with all the other facts and circumstances in determining whether or not negligence is established thereby.

"When an action under the guest statute is based on gross negligence, the comparative negligence statute is applicable. * * *

"If one, knowing and comprehending the danger, voluntarily exposes himself to it, though not negligent in so doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom."

In considering another case involving the sufficiency of the evidence to submit to the jury the question of liability in a case involving injuries to a guest, the court in Olson v. Shellington, 167 Neb. 564, 94 N. W. 2d 20, held: "An issue of gross negligence is for the jury if the evidence relating thereto is conflicting and from which reasonable minds might arrive at different conclusions.

"When the evidence is resolved most favorably to the existence of gross negligence and thus the facts are determined, the inquiry of whether they support a finding of gross negligence is one of law.

"A guest, to recover damages from a host for injury received by the guest while riding in an automobile operated by the host, must prove by the greater weight of the evidence in the case the gross negligence of the host relied upon and that it was the proximate cause of the accident and injury.

"Gross negligence within the meaning of the motor vehicle guest statute means great and excessive negligence or negligence in a very high degree. In indicates the absence of slight care in the performance of duty.

"Gross negligence within the meaning of the motor vehicle guest statute has also been defined as an entire failure to exercise care or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the safety of others. * * *

"More than one act of negligence may in combination amount to gross negligence within the motor vehicle guest statute."

In Werner v. Grabenstein, 165 Neb. 231, 85 N. W. 2d 297, this court said: "A finding of gross negligence is justified if there is evidence of imminence of danger

which was apparent to or known by the operator of an automobile and he was timely*cautioned by the guest concerning the manner of his operation of the automobile but he persisted in his negligent operation thereof and if there is evidence that the operator was heedless of the consequences which might ensue by his negligent operation of the automobile consisting not only of rate of speed but of other conditions, known to the operator, which enhanced the peril."

Considering the evidence previously outlined in the light of the rules of law hitherto set forth, it appears there was evidence and inferences from evidence from which, if believed by it, the jury might conclude that the defendant operated his automobile at an unlawful and dangerous rate of speed in the nighttime while approaching a "T" intersection which was a short distance away. Further, that he was twice warned by his guest to slow down but thereafter persisted in so driving that he proceeded through a warning sign and a stop sign while approachng a reflectorized sign at a dead end, when he was thoroughly familiar with the conditions at the intersection, and that while not intoxicated, he was to some extent under the influence of intoxicating liquor which affected his driving. We think from this evidence, if believed, the jury could attribute gross negligence to the defendant.

There is also evidence that the plaintiff had purchased liquor for the defendant and had participated in its consumption under circumstances which, if believed, might charge the plaintiff with contributory negligence or assumption of risk involved in riding with the defendant. On the other hand, there is evidence from which the jury might infer that the plaintiff and defendant had taken one drink of whisky each some 3 hours or more before the accident and only two or three drinks of beer thereafter, and that if the defendant indulged in further drinking, he did so either alone or with others. There was evidence if given credence by

the jury that defendant's subsequent drinking, if it occurred, was not known by the plaintiff when he accepted the invitation to ride with the defendant before the accident and that he had no opportunity to leave the car thereafter.

The trial court submitted to the jury the issues of the defendant's gross negligence and the plaintiff's assumption of risk and contributory negligence under the comparative negligence statute. As the trier of the facts, the jury determined the issues submitted in favor of the plaintiff. We think the trial court committed no error in submitting the issues.

The defendant assigns error to the trial court in the giving of instruction No. 5. That instruction sets forth the definitions of negligence, gross negligence, and slight negligence to which the defendant first directs his complaints. They were set out as follows: "The term 'negligence,' as used in these instructions, means that failure to exercise such care, prudence and foresight as under the circumatances (sic) duty requires should be given or exercised.

" 'Gross negligence' is defined as want of slight care and diligence and it includes a failure to exercise any care to avoid injury to person or property.

" 'Slight negligence' means the want of great care and diligence, or in other words, the absence of that degree of care and diligence which persons of extraordinary prudence and foresight are accustomed to use."

With respect to the definition of "negligence" defendant cites Edmunds v. Ripley, 172 Neb. 797, 112 N. W. 2d 385, and Burhoop v. Brackhan, 164 Neb. 382, 82 N. W. 2d 557, where the definition which was approved is set out as: "Negligence is the doing of something which an ordinarily prudent person would not have done under the same or similar circumstances, or the failure to do something which an ordinarily prudent person would have done under the same or similar circumstances." The definition in the cited cases has been approved many

times by this court but it does not follow that it cannot be defined otherwise. The definition as used by the trial court in the cause before us appears to be taken from the decision of this court in Brotherton v. Manhattan Beach Improvement Co., 48 Neb. 563, 67 N. W. 479, 58 Am. S. R. 709, 33 L. R. A. 598, where it was approved. The cited case and the definition used were referred to with approval although other definitions were set out also in Geist v. Missouri P. Ry. Co., 62 Neb. 309, 87 N. W. 43. We think the definition of negligence used was not erroneous.

The exact definitions of "slight negligence" and "gross negligence" used by the trial court in this instruction were both considered in Johnson v. Batteen, 144 Neb. 384, 13 N. W. 2d 625, and were held not to be prejudicially erroneous. We think the contentions of error of the defendant with respect to the definitions in instruction No. 5 are without merit.

The defendant contends the trial court committed error in not defining contributory negligence, that the issue of contributory negligence should have been submitted as a separate issue, and that it was not properly submitted. A review of all the instructions, however, shows that in instruction No. 1 the allegations of the plaintiff's petition with respect to the defendant's gross negligence were set out, and also the allegations of the defendant with respect both to assumption of risk and to the contributory negligence of the plaintiff were given. The definitions of negligence, slight negligence, and gross negligence which were given have been previously discussed. Instruction No. 2 placed the burden upon the plaintiff to prove by a preponderance of evidence his allegations of gross negligence. Instruction No. 3 placed the burden upon the defendant to similarly prove his allegations with respect to assumption of risk and contributory negligence. Both instructions No. 2 and No. 3, when taken together, clearly show that if the jury should find the defendant grossly negligent as

alleged, it should find for plaintiff unless it found he had assumed the risk set out in the instructions or that his injury was proximately caused by his own negligence. In the latter event, instructions No. 2 and No. 3 were made subject to instruction No. 14 on comparative negligence to which both No. 2 and No. 3 referred by number. Instruction No. 14 need not be and should not be discussed by us. It was not objected to in the motion for new trial and obviously could not be objected to as erroneous because it was specifically agreed upon and stipulated to by the parties before it was given. Various statutory and other duties of each party were stated in the trial court's other instructions and defendant makes no objection to them in his argument. The defendant's objections to the instructions are without merit.

From what has been said we find the cause was properly submitted, and the judgment of the trial court was right and is affirmed.

AFFIRMED.