Phil KRAHN, as Administrator of the Estate and Personal Representative of Theodore J. Hon, Jr., Deceased, Appellant (Plaintiff below),

v.

Floyd Ellsworth LaMERES and Beulah LaMeres, Appellees (Defendants below).

No. 3872.

Supreme Court of Wyoming.

April 14, 1971.

David N. Hitchcock, Laramie, for appellant.

Pence & Millett, Alfred M. Pence, Laramie, for appellees.

Before McINTYRE, C. J., and PARKER, McEWAN, and GRAY, JJ.

Mr. Justice PARKER, delivered the opinion of the court.

Phil Krahn, as administrator of the estate and personal representative of Theodore J. Hon, Jr., deceased, brought action against defendants for deceased's wrongful death while a passenger in an automobile owned by Beulah LaMeres and driven by her son, Floyd Ellsworth LaMeres. Defendants denied generally, asserting that decedent was a guest in the LaMeres car, and alleged affirmatively the deceased's contributory negligence and assumption of risk. The cause was tried to a jury and at the conclusion of plaintiff's case in chief defendants moved for an instructed verdict on the grounds that plaintiff had failed to produce sufficient evidence to establish a prima facie case in his behalf. The court granted the motion; and plaintiff has appealed from the resultant judgment and verdict, raising here the single issue of whether the district court on the basis of the evidence presented erred in directing a verdict for defendants rather

than submitting to the jury the question of gross negligence.

The facts are simple and not in any substantial dispute. Floyd Ellsworth La-Meres, who had turned sixteen May 8, 1967, had secured his Wyoming driver's license the next day, without having taken "the driver's training or education course in school," and approximately a month later on June 12, 1967, was driving his mother's car, a 1960 Pontiac, when the fatal accident occurred about 3:40 p. m. He had with him three other young men, his cousin, the deceased, who was riding in the front seat with him, Larry Smith, who was also killed, and James Rocchio in the rear. They had no definite destination and were just "riding around," but LaMeres had told the others that he was going to get gas at a cut-rate station some two miles south of Laramie. It had been raining, some said hailing, but there was a question as to the rain's intensity or the existence of the hail. As they crossed the overpass on the south edge of Laramie, LaMeres was driving fast. He said "Faster than it should be, about seventy, seventy-five, maybe." Rocchio said the speed was "eighty-five to ninety or seventy-five to eighty." Rocchio asked LaMeres to slow down, which he did, and according to Rocchio, he later was driving about fifty. As they neared the road which crossed the highway from the Monolith Cement Plant on the right toward a county road on the left, which provided access to the "Gas Mat," they approached a 1958 Chevrolet pickup truck.[1]

The occurrences immediately prior to the accident are reflected by the statements of LaMeres, the surviving passenger, the driver of the pickup, and the driver of the Safeway truck, with which the Pontiac collided. LaMeres testified:

"* * * [As I crossed the overpass] Jim Rocchio told me I should slow down my speed. That was the first thing I did, and it was still raining pretty hard and I slowed it down to about fifty. * * * then, I was headed on south and there was this—I believe it was—I am not sure of the year, but this old truck. I know it was like, almost on the parking lane and right side, both. * * * I saw it and Jim Rocchio also saw it, and I tried to apply my brakes and it slid, and I was getting nearer, closer to the truck, and I just turned my wheel from the truck and that is when I hit the Safeway truck [which I did not see before impact]. * * *

* * * * * *

"Q. Did you look anywhere but at the highway and at the pickup truck? A. No.

"Q. You don't recall turning your head to look into the back seat? A. Yes, I do.

"Q. When did that happen? A. Just as we were about—where the port of entry was [approximately one mile north of the scene of the accident].

"Q. What was the occasion for that? A. Larry Smith in the back seat, he dropped something on the floor and everybody was looking down at it, and I glanced my head back, just took a look.

* * * * * *

"Q. Do you recall Jim Rocchio telling you, 'Watch out, there is a truck ahead,' or something to that effect? A. Yes.

"Q. Had you seen the pickup before he told you about it? A. Yes, I seen the truck about the same time he did.

"Q. You hadn't seen it before you turned your head to the back seat? A. No.

* * * * * *

"Q. How far away was it from you when you first saw it? A. About a block and a half.

1. LaMeres testified he was going "at least" fifty miles per hour when he approached the pickup truck. Rocchio could only say that a mile and a half before the wreck LaMeres had slowed down to fifty and that although it was possible he increased his speed thereafter Rocchio was not conscious of it.

"Q. Did you immediately jam on your brakes when you saw it? A. No. I didn't.

\* \* \* \* \* \*

"Q. How close to the truck do you think you were when you jammed on your brake? A. Maybe four or five car lengths.

"Q. Did you know whether you could stop your car at that speed in four or five car lengths? A. No, I didn't. I thought I could.

"Q. Had you driven that fast in town? A. No.

"Q. Had you driven that fast on the highways out of town? A. No.

"Q. Had you ever tried stopping your car from the speed of fifty miles an hour? A. No."

Rocchio testified:

"Q. Will you just describe what happened after you asked him to slow down? A. He slowed down and we were all just talking and all of a sudden even I saw this pickup truck in front of us [probably a half a block away, around fifty feet]. It looked like it was really close. It was going really slow. I said, 'Floyd, there's a truck in front of us.' So he looked back and applied his brakes and we started to slide.

"Q. Pardon me. You say he looked back. Where had he been looking? A. He was looking in the back seat. We were trying to find something on the floor or something. He looked, you know, out the front and he saw this pickup and so he started to slow down. \* \* \*

\* \* \* \* \* \*

"\* \* \* [LaMeres] wasn't really, you know, looking and hanging over the back seat. He just kind of turned his head back to see what we were doing \* \* \*. He just kind of glanced back."

The pickup driver said he was proceeding south in his own lane of traffic, looked in his mirrors, and "noticed this car [the LaMeres vehicle] coming up pretty fast on me. \* \* \* I noticed the car was fishtailing, swerving. The first thing I could think of, I knew he was going to hit me or something, so I pulled to the right of the highway the minute I see him gaining fast, I pulled to the right, and just at the time I turned, I heard the wreck." He said he thought his speed was from forty to fifty-five miles an hour when he pulled to the right.

The Safeway truck driver who was proceeding northerly stated that:

"\* \* \* When I was about 100 feet from the pickup, I became aware of a speeding 1960 Pontiac coming up behind the pickup headed south. The road was straight and I was conscious of the pickup, but didn't notice the Pontiac until this time. It came upon the pickup fast and the driver must have hit his brakes and began swerving out of control. He first skidded towards the center line, but I don't believe he came across it. This is when I first noticed him, and he was still over 100 feet from me. He then skidded west to his right toward the shoulder, and the[n] across the center line to his left into my path. I braked when [I] noticed his first swerve and cut right. At the point of impact I was on the shoulder with my left wheel on the white line marking the shoulder, or emergency parking lane. His car came completely onto my side of the road, in a skid, and was turned around so that my left front struck his right side. My tachometer chart showed I was going 53 miles per hour before the accident and 45 at the time of impact. \* \* \*"

Requisite to any exploration of the central question here is a realization that this area of law has been fraught with difficulties and arguments stemming not only from diverse statutes in the various jurisdictions but even more from ambiguous and vague definitions of "gross negligence."[2] This situation has presented a

2. The pertinent Wyoming statute is § 31–233, W.S.1957 (C.1967).

climate often emboldening enthusiastic litigants to engage in semantics and selected use of phrases favorable to their own contentions. The result has been lamentable, especially in the undue burden cast on trial courts by motions for directed verdicts, which must be granted or denied within a limited time at the court's peril with no opportunity for research.

█ In our first pronouncement on the question in 1940, we discussed the Wyoming guest statute's origin, analyzed numerous decisions, and approved a Massachusetts holding, which defined gross negligence as being a manifestly smaller amount of watchfulness and circumspection than required of a person of ordinary prudence but falling short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong and said that ordinary and gross negligence differ in degree of inattention—both differing in kind from willful and intentional conduct, which is or ought to be known to have a tendency to injure.[3] At that time we said that the existence of gross negligence must be determined from the facts and circumstances of each case and that ordinarily the question of negligence whether slight or gross is one of fact. Although in later cases the definition was expanded and ramified, in essence we have never departed from it. Some eleven years later in Hawkins v. L. C. Jones Trucking Co., 68 Wyo. 275, 232 P.2d 1014, 1023, we referred to gross negligence as being indifference to present legal duty and utter forgetfulness of legal obligations, a statement which we approved in Arnold v. Jennings, 75 Wyo. 463, 296 P.2d 989, 990, and Altergott v. Story, Wyo., 388 P.2d 196, 198. At different times we have held that certain acts of a driver, considered alone, would not constitute gross negligence. In Meyer v. Culley, 69 Wyo. 285, 241 P.2d 87, 95, we said excessive speed under some circumstances might amount to negligence, under others to gross negligence, and under

still others to willful misconduct. In McClure v. Latta, Wyo., 348 P.2d 1057, 1062, a case which reviewed and discussed at some length our general position regarding gross negligence, we made it clear beyond question that gross negligence is generally a question of fact for the jury (or the trial court sitting without a jury) and that it becomes a question of law only when it is clear that but one conclusion can be drawn, or to state it another way, if reasonable minds might draw different conclusions from the evidence, the question is for the finder of fact.

█ Before analyzing the instant situation in the light of our mentioned cases, we should refer to a point which although not supported by counsel is of importance here, i. e., a series of acts of ordinary negligence may operate under certain circumstances to produce gross negligence. Loving v. Freeman, 93 Idaho 426, 462 P.2d 519, 521; Burrows v. Nash, 199 Or. 114, 259 P.2d 106, 111; Hess v. Holdsworth, 176 Neb. 774, 127 N.W.2d 487, 494; 5 Blashfield, Automobile Law and Practice, pp. 164–165 (1966).

██ Plaintiff contends and defendants concede that LaMeres was guilty of certain acts of negligence. However, it is denied by defendants that any of these constituted gross negligence. Various matters must be considered in determining whether LaMeres' behavior taken in the entirety constituted gross negligence. He was driving a motor vehicle without any showing of previous instruction or knowledge as to proficiency in driving except that required under § 31–263, W.S.1957 (C.1967). In that connection we should perhaps observe the view that a minor cannot be expected to act with adult circumspection but rather only with that of a minor of like age and experience under similar circumstances. Annotation, 97 A.L.R.2d 861, 863. However, we perceive no valid reason why today when the legislative and executive branches of all American governments devote so much time, thought, and public ex-

3. Mitchell v. Walters, 55 Wyo. 317, 100 P.2d 102, 107.

pense to the improvement of highway safety that the judiciary should initiate multiple standards for the young, the mature, and the aged—or for any other reason. We reject such a position and join with those jurisdictions which have said that a minor will be held to the same standard of care as an adult. Allen v. Ellis, 191 Kan. 311, 380 P.2d 408, 412–413; Wagner v. Shanks, Del., 194 A.2d 701, 708.

It is unquestioned that the speed with which the fatal car crossed the viaduct was excessive even by the admission of the driver, and at the time of the crash was greater than was reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. Although LaMeres testified he first saw the pickup when he was a block and a half distant, he also said that he saw it at about the same time Rocchio did, and it will be recalled Rocchio had not seen it until they were within "half a block" of it or "around fifty feet." This evidence must be correlated with the further testimony of LaMeres that when he first saw the pickup it was "in the parking lane and road, both, almost in the middle * * * [that is] straddling the right-hand marker line," and that of the pickup driver who said he was in his own lane of traffic until he saw the LaMeres vehicle coming up fast on him, fishtailing and swerving, and at that point he pulled to the right. It is also uncontroverted that LaMeres had not seen the pickup prior to his turning his head toward the back seat. There were other circumstances which the jury was entitled to weigh as negligence, not the least of which was that LaMeres never at any time saw the Safeway truck before the crash and did not recall in which direction he was skidding when he turned his wheel to the left, from which circumstance it might be inferred that he did not know which way to turn to correct a skid.

Contemplation of these several incidents leads us to the view that LaMeres' behavior might well have been interpreted by the trier of fact as a manifestly smaller amount of watchfulness and circumspection than required of a person of ordinary prudence, indifference to present legal duty, and utter forgetfulness of legal obligations, or equally serious, a total ignorance of such duty and obligations. Thus, we cannot agree that only one conclusion may be drawn from the evidence and that reasonable minds could not differ. Even were we to assume that no single act of LaMeres standing alone would constitute gross negligence, we are unable to say that a combination of these acts when considered in the aggregate would not establish gross negligence, and thus must hold the instruction for directed verdict improper. Accordingly, the cause is remanded for further proceedings consistent with the views herein expressed.

Reversed and remanded.